**Brenda LAMPKIN, As Legal Guardian of Jessica Lampkin and Christine Lampkin, Minors, et al., Appellants,**

v.

**DISTRICT OF COLUMBIA, A Municipal Corporation, et al., Appellees.**

No. 92–7143.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1993.

Decided July 1, 1994.

As Amended July 28, 1994.

Kerrie C. Dent, Washington, DC, argued the cause for appellants. With her on the briefs were James D. Miller, Maria Foscarinis, and Arthur B. Spitzer, Washington, DC.

Donna M. Murasky, Asst. Corp. Counsel, Washington, DC, for the District of Columbia, argued the cause for appellees. With her on the brief were John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, DC.

Deborah E. Greenspan and Gary Thompson, Washington, DC, were on the brief for amici curiae U.S. Representatives Thomas Foglietta, George Miller, Tom Lantos, Louise Slaughter, and Jolene Unsoeld.

Before EDWARDS, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge SENTELLE.

BUCKLEY, Circuit Judge:

Parents of homeless children residing in the District of Columbia seek to invoke 42 U.S.C. § 1983 to enforce provisions of the Stewart B. McKinney Homeless Assistance Act. Concluding that the McKinney Act does not confer enforceable educational rights on homeless children, the district court granted the District of Columbia's motion to dismiss. Because we disagree with the district court's interpretation of the governing Supreme Court case law, we reverse and remand for further proceedings.

## I. INTRODUCTION

The McKinney Act, Pub.L. No. 100–77, 101 Stat. 482 (codified as amended at 42 U.S.C.A. §§ 11301 *et seq.* (West Supp.1993)), was passed in 1987 in response to "the critically urgent needs of the homeless," 42 U.S.C. § 11301(b)(2) (1988), including the proper education of their children. 42 U.S.C. §§ 11431–35 (Supp. IV 1992). The Act is a mix of large visions and gritty detail, combining specific sections dealing with the provision of education to homeless children and youths with a broad congressional policy that "each State educational agency ... assure that each child of a homeless individual and each homeless youth have access to a free, appropriate public education ... [and that] homelessness alone ... not be sufficient reason to separate students from the mainstream school environment." *Id.* § 11431.

To achieve this goal, the Secretary of Education is empowered to grant funds to States participating in the programs authorized by the McKinney Act. 42 U.S.C. § 11432(a) (1988). Grants may be used, among other purposes, to "establish or designate an Office of Coordinator of Education of Homeless Children and Youth" and to "prepare and carry out the State plan described in subsection (e) of this section." 42 U.S.C. § 11432(c)(3) & (4) (Supp. IV 1992). Subsection (d) defines the functions of the Coordinator, which include the duty to "develop and carry out the State plan" and to "facilitate coordination" between state agencies and others providing assistance to homeless children and their families. *Id.* § 11432(d)(2) & (4).

Subsection (e), which is captioned "State plan," consists of nine paragraphs that may be divided into three parts. The first consists of paragraph (1) and its nine subparagraphs. These describe in general terms the concerns that are to be addressed by the plan: e.g., establishment of procedures for the resolution of disputes regarding the educational placement of homeless children and youths, assurance of their ability to participate in food programs, and undertaking to protect them from being isolated or stigmatized. *Id.* § 11432(e)(1)(A)–(I). The second part, paragraph (2), requires that the state plan assure, to the extent feasible under state law, "that local educational agencies within the State will comply with the requirements of paragraphs (3) through (9)." *Id.* § 11432(e)(2).

Paragraphs (3) through (9), which comprise the third part of subsection (e), are devoted to the "gritty details"—the specific means by which the educational, health, and other needs of the Act's beneficiaries will be addressed. To cite three examples that are germane here, paragraphs (3), (5), and (7) read in relevant part as follows:

> (3)(A) The local educational agency of each homeless child and each homeless youth shall either—
>
> (i) continue the child's or youth's education in the school of origin—
>
> (I) for the remainder of the academic year; or
>
> (II) in any case in which a family becomes homeless between academic years, for the following academic year; or
>
> (ii) enroll the child or youth in any school that nonhomeless students who live in the attendance area in which the child or youth is actually living are eligible to attend;

whichever is in the child's best interest or the youth's best interest.

(B) In determining the best interests of the child or youth for purposes of making a school assignment under subparagraph (A), consideration shall be given to a request made by a parent regarding school selection.

.    .    .    .    .

(5) Each homeless child shall be provided services comparable to services offered to other students in the school selected according to the provisions of paragraph (3), including transportation services . . .; and school meals programs.

.    .    .    .    .

(7) Each local educational agency serving homeless children or youth that receives assistance under this subchapter shall coordinate with local social services agencies, and other agencies or programs providing services to such children or youth and their families.

*Id.* § 11432(e)(3), (5) & (7).

Appellants here are homeless children living in the District of Columbia, which is deemed a State for purposes of the McKinney Act. 42 U.S.C. § 11421(d) (1988). They filed this action in the district court pursuant to 42 U.S.C. § 1983 (1988), which provides a cause of action against persons who infringe upon federal constitutional or statutory rights while acting "under color" of state law. Appellants allege that the District has violated section 11432(e)(3), (5), (7), (8) and (9), as well as sections 11431(1), (2) and 11432(c)(2), (4). They seek an order requiring, among other things, that the District consider parents' requests and make "best interests" determinations when placing homeless children in schools; that it assure homeless children the transportation necessary to attend those schools; and that it ensure them access to various educational and school meal programs, and other services.

The district court found that the McKinney Act did not create an enforceable right of action under section 1983 and dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. *Lampkin v.*

*District of Columbia,* Civ. No. 92–0910, slip op. at 14–15, 1992 WL 151813 (D.D.C. June 9, 1992). Thus the sole question before us on appeal is whether the homeless children can enforce the relevant provisions of the McKinney Act pursuant to section 1983, a question we answer in the affirmative.

## II. Discussion

■ Since 1980, the Supreme Court has recognized that section 1983 may be invoked to challenge violations of federal statutes. *Maine v. Thiboutot,* 448 U.S. 1, 6–8, 100 S.Ct. 2502, 2505–07, 65 L.Ed.2d 555 (1980). This rule has its exceptions: A statute will not be deemed enforceable under section 1983 if Congress did not intend to create any enforceable rights in it (which may be evidenced by the provision of a comprehensive remedial scheme in the statute itself) and where the statute "did not create enforceable rights, privileges, or immunities within the meaning of § 1983." *Wright v. Roanoke Redev. and Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987). These exceptions are more easily stated than applied, as will be apparent from the Supreme Court's recent decisions in *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), and *Suter v. Artist M.,* —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992).

### A. *Wilder v. Virginia Hospital Association*

In *Wilder,* the plaintiffs challenged the method by which the State of Virginia reimbursed health care providers under the Medicaid Act, 42 U.S.C. § 1396 *et seq.* (1988). In particular, the Court faced the question

whether the Boren Amendment to the Act, which requires reimbursement according to rates that a "State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities," is enforceable in an action pursuant to § 1983.

*Wilder,* 496 U.S. at 501–02, 110 S.Ct. at 2513–14 (quoting 42 U.S.C. § 1396a(a)(13)(A)).

Drawing on its decision in *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), the Court established a test to determine whether a statutory provision creates a federal right enforceable under section 1983. First, the provision must have been intended to benefit the putative plaintiff. *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. If it was so intended,

> the provision creates an enforceable right unless it [1] reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit ... or [2] unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.

*Id.* (internal quotation marks and citations omitted). Once it has been determined that an enforceable right exists, the statute must be examined to determine whether "Congress has foreclosed such enforcement of the statute in the enactment itself." *Wright*, 479 U.S. at 423, 107 S.Ct. at 770. In applying this test to the Boren Amendment, the Court stated that there was little doubt that health care providers were its intended beneficiaries. *Wilder*, 496 U.S. at 510, 110 S.Ct. at 2517. The Court then reasoned that as the amendment was "cast in mandatory rather than precatory terms," it "imposes a binding obligation on States participating in the Medicaid program to adopt reasonable and adequate rates and ... is enforceable under § 1983 by health care providers." *Id.* at 512, 110 S.Ct. at 2518.

This interpretation, which gives substantive teeth to the reimbursement provision contained in the Medicaid Act, was criticized by the dissenting justices. *See id.*, 496 U.S. at 524, 110 S.Ct. at 2525 (Rehnquist, C.J., dissenting, joined by O'Connor, Scalia, and Kennedy, JJ.). The dissenters agreed that a signatory State was obligated to follow a particular process in providing *some* level of reimbursement to health care providers but concluded that the exact level of reimbursement was left to the discretion of the States. *Id.* at 527–28, 110 S.Ct. at 2526–27. The majority disagreed, holding that "the only plausible interpretation of the amendment is that by requiring a State to *find* that its rates are reasonable and adequate, the statute imposes the concomitant obligation to adopt reasonable and adequate rates." *Id.* at 514–15, 110 S.Ct. at 2519–21 (emphasis in original). The majority also rejected the argument that the obligation imposed by the amendment was too "vague and amorphous" to be judicially enforceable. *Id.* at 519, 110 S.Ct. at 2522. Citing the guidance set forth in the statute and accompanying regulations, including "the objective benchmark of an 'efficiently and economically operated facility' providing care in compliance with federal and state standards while at the same time ensuring 'reasonable access' to eligible participants," the majority concluded that while the statute grants the States "substantial discretion," it does not foreclose judicial review. *Id.*

Turning to the second prong of the inquiry, the majority concluded that Congress had not foreclosed enforcement of the Medicaid Act under section 1983. It found that "the Act [did] not expressly preclude resort to § 1983"; nor did it "create[ ] a remedial scheme that is 'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.'" *Id.* at 521, 110 S.Ct. at 2523 (quoting *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981)). In the eyes of the Court, the Act's grant of authority to the Secretary of Health and Human Services "to withhold approval of plans" or "to curtail federal funds to States whose plans are not in compliance with the Act" was not "sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983." *Id.*, 496 U.S. at 521–22, 110 S.Ct. at 2523–24.

B. *Suter v. Artist M.*

Two years later, the Court again addressed the availability of the section 1983 remedy. In *Suter v. Artist M.*, — U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Court was called upon to determine whether a provision of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–28, 670–79a (1988), could be

enforced under section 1983. Under the Child Welfare Act, States seeking federal reimbursement of "a percentage of foster care and adoption assistance payments" "must submit a plan to the Secretary of Health and Human Services for approval." *Suter,* —— U.S. at ——, 112 S.Ct. at 1363. To be approved, a plan must meet sixteen requirements, the following among them:

> [I]n each case, *reasonable efforts* will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home....

*Id.,* at ——, 112 S.Ct. at 1364 (quoting 42 U.S.C. § 671(a)(15) (emphasis added)). In *Suter,* the plaintiffs sought to use section 1983 as the procedural vehicle to obtain substantive enforcement of this "reasonable efforts" provision.

In examining the nature of the obligations created by the Child Welfare Act, the Court observed that

> [t]he legitimacy of Congress' power to legislate under the spending power ... rests on whether the State voluntarily and knowingly accepts the terms of the "contract." ... [I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

*Id.,* at ——, 112 S.Ct. at 1366 (quoting *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981)). Thus the critical inquiry in *Suter* was whether, "in light of the entire legislative enactment," the Child Welfare Act "unambiguously confer[red] upon [its] beneficiaries ... a right to enforce the requirement that the State make 'reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family." *Id.,* —— U.S. at ——, 112 S.Ct. at 1367.

The Court began its inquiry with the statutory language—"reasonable efforts will be made"—and noted that it was "mandatory in its terms." *Id.,* at ——, 112 S.Ct. at 1367. Nonetheless, the Court's central focus was on what action was required of a State in exchange for the grant of federal funds:

Here, the terms of § 671(a) are clear: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary." Therefore the [Child Welfare] Act does place a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan approved by the Secretary which contains the 16 listed features. *Id.* (footnote omitted). Because the State's sole obligation was to submit a plan for the Secretary's approval, the Court concluded that section 1983 could not be invoked.

In so holding, the Court emphasized that each statute is to be interpreted on its own terms. *Id.,* at —— n. 8, 112 S.Ct. at 1367 n. 8 ("our holding today ... merely counsels that each statute must be interpreted by its own terms."). The Court distinguished *Wilder* on the grounds that

> in that case we held that the Boren Amendment actually required the States to adopt reasonable and adequate rates, and that this obligation was enforceable by the [health care] providers. We relied in part on the fact that the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating rates.

*Id.,* at ——, 112 S.Ct. at 1368. The Court then contrasted the Child Welfare Act, where "[n]o further statutory guidance is found as to how 'reasonable efforts' are to be measured." *Id.* Similarly, no regulatory provision evidenced "any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary." *Id.,* at ——, 112 S.Ct. at 1369 (footnote omitted). The Court thus concluded that the directive to use reasonable efforts was so open-ended, and the resulting state discretion so broad, that judicial enforcement was an impossibility.

In foreclosing private enforcement of the Child Welfare Act's "reasonable efforts" clause, the Court noted that the Act contained alternative mechanisms for its enforcement. These included the provisions, in subsection 671(b), that allowed the Secretary

> to reduce or eliminate payments to a State on finding that the State's plan no longer complies with § 671(a) or that "there is a

substantial failure" in the administration of a plan such that the State is not complying with its own plan.

*Id.,* at ——, 112 S.Ct. at 1368. The Court also referred to a provision conditioning federal reimbursement of foster care payments made with respect to a child involuntarily removed from his home on " 'a judicial determination to the effect that continuation [in the child's home] would be contrary to the welfare of such child.' " *Id.* (quoting 42 U.S.C. § 672(a)(1)). The Court concluded from these provisions that "the absence of a remedy to private plaintiffs under § 1983 does not make the reasonable efforts clause a dead letter." *Id.,* at ——, 112 S.Ct. at 1369 (footnote omitted).

## C. Private Enforcement of the McKinney Act

■ In applying this jurisprudence to the McKinney Act, the first question to ask is whether the statute was intended to benefit persons such as appellants' children. *See Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517; *Suter,* —— U.S. at ——, 112 S.Ct. at 1367. This point is not in dispute here: The parties all agree that the McKinney Act was enacted to benefit homeless children. *See* 42 U.S.C. § 11431. That said, we must hold that the Act "creates an enforceable right *unless* it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit." *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517 (citation and internal quotation marks omitted; emphasis added). Mindful of the need "to analyze the statutory provisions in detail, in light of the entire legislative enactment, to determine whether the language in question create[s] enforceable rights, privileges, or immunities within the meaning of § 1983," *Suter,* —— U.S. at ——, 112 S.Ct. at 1367 (internal quotation marks omitted), we must determine whether the Act creates rights that are substantively enforceable under section 1983.

Section 11432(f) of the McKinney Act provides:

No State may receive a grant under this section unless the state educational agency submits an application to the Secretary at such time, in such manner, and containing or accompanied by such information as the Secretary may reasonably require.

42 U.S.C. § 11432(f) (1988). The regulations issued by the Secretary stipulate that a State may not begin to obligate funds received pursuant to a federal grant until the later of the two following dates: "[t]he date that the State plan is mailed or hand delivered to the Secretary in substantially approvable form" and "[t]he date that the funds are first available for obligation by the Secretary." 34 C.F.R. § 76.703(a)(1) & (2). The regulations further stipulate that a State

shall comply with the State plan and applicable statutes, regulations, and approved applications, and shall use Federal funds in accordance with those statutes, regulations, plan, and applications.

*Id.* at § 76.700. Here, of course, the "applicable statute[ ]" is the McKinney Act, and the obligations it imposes on participating States are clear. The Act requires that grants provided by the Secretary be used, *inter alia,* "to prepare and carry out the State plan," 42 U.S.C. § 11432(c)(4), and that "[e]ach plan ... assure ... that local educational agencies within the State will comply with the requirements of paragraphs (3) through (9)," *id.* at § 11432(e)(2). Paragraphs (3) through (9) in turn provide highly specific instructions for meeting a variety of needs of homeless children and youths. This structure markedly contrasts with that of the Child Welfare Act, with which the *Suter* Court was concerned. Although both Acts describe in detail the contents of the plan a participating State must adopt, only the McKinney Act provides specific directions for the plan's execution. *Compare* 42 U.S.C. § 671(a) *with* 42 U.S.C. § 11432(e). It is this distinction that is ignored by our dissenting colleague, who concludes that "the genuine statutory duty of a recipient state under the McKinney Act is to prepare and carry out a plan, *designed to* achieve nine designated goals." Dissent at 2 (internal quotation marks omitted, emphasis in original). While we agree that the McKinney Act requires the State to submit such a plan, it also differs significantly from the Adoption Act in that paragraphs (3) through (9) of subsection

11432(e) of the McKinney Act not only inform the State in great detail on how its plan is to be implemented, they impose obligations that are independent of the plan. These are set forth in specific, mandatory terms; and it is these that appellants seek to enforce. Thus, paragraph (3) requires that

> [t]he local educational agency of each homeless child and each homeless youth *shall* [assign the child or youth to a school which] is in the child's best interest or the youth's best interest.... In determining the best interests of the child or youth ... consideration *shall* be given to a request made by a parent regarding school selection.

*Id.* § 11432(e)(3) (emphasis added). Succeeding paragraphs stipulate that "[e]ach homeless child *shall* be provided services comparable to services offered to other students in the school ...," *id.* § 11432(e)(5) (emphasis added), and that records ordinarily kept by the school "*shall* be maintained" so as to be available when the child enters a new school district. *Id.* § 11432(e)(6) (emphasis added). Furthermore, they provide that

> [e]ach local educational agency serving homeless children or youth that receives assistance under this subchapter *shall* coordinate with local social services agencies, and other agencies or programs providing services to such children or youth and their families[,]

*id.* § 11432(e)(7) (emphasis added), and "*shall* designate a homelessness liaison." *Id.* § 11432(e)(8) (emphasis added). We read this language as "mandatory rather than hortatory." This interpretation is supported by paragraph (2), which describes paragraphs (3) through (9) as "requirements" rather than options. *Id.* § 11432(e)(2).

In addition to the mandatory obligations listed in those seven paragraphs, the McKinney Act also provides that

> [t]he Coordinator of Education of Homeless Children and Youth established in each State *shall* ... once every 2 years, gather data on the number and location of homeless children and youth in the State ... develop and carry out the State plan ... [and] facilitate coordination between

the State education agency, the State social services agency, and other agencies providing services to homeless children and youth and their families.

*Id.* § 11432(d). The language of these provisions is sufficiently clear to put the States on notice of the obligations they assume when they choose to accept grants made under the Act. *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981) ("if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously" (footnote omitted)).

Moreover, as we noted earlier, the Secretary has promulgated regulations stipulating that for state-administered programs like the McKinney Act, "[a] State ... shall comply with the State plan and applicable statutes, regulations, and approved applications, and shall use Federal funds in accordance with those statutes, regulations, plan, and applications." 34 C.F.R. § 76.700. *Contrast Suter,* —— U.S. at ——, 112 S.Ct. at 1369 (noting that the regulations accompanying the Child Welfare Act "do not evidence a view that [the statute] places any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary" (footnote omitted)). Here, the regulations merely reinforce our conclusion that States undertake well-defined obligations when they elect to accept funds under the McKinney Act.

Finally, the McKinney Act contains no statutory mechanisms for the administrative enforcement of the beneficiaries' rights, suggesting that Congress did not intend to foreclose a private cause of action that is enforceable under section 1983. *See, Suter,* 112 S.Ct. at 1368–69 (citing alternative enforcement mechanisms provided by sections 671(b) and 672(a)(1) of the Child Welfare Act as showing that "the absence of a remedy to private plaintiffs under § 1983 does not make the reasonable efforts clause a dead letter" (footnote omitted)). Thus there is nothing in the structure of the McKinney Act to suggest that its beneficiaries may not invoke section 1983 to enforce their rights under the Act.

One hurdle remains before we can declare that the rights conferred on homeless children by the Act are enforceable in federal court. Even if a statute confers rights on a beneficiary, their judicial enforcement requires that they not be overly "vague and amorphous." *Wilder*, 496 U.S. at 519, 110 S.Ct. at 2522 (internal quotation marks omitted). The District argues that the statutory requirement that a school be selected in accordance with the "best interests" of a homeless child is at least as vague as the "reasonable efforts" clause that the Court found too amorphous in *Suter*. *See New York v. United States*, —— U.S. ——, ——, 112 S.Ct. 2408, 2445, 120 L.Ed.2d 120 (1992) (Justice White, concurring in part, dissenting in part, describing *Suter* as "not permitting a § 1983 suit under a Spending Clause statute when the ostensible federal right created was too vague and amorphous").

This argument asserts, in essence, that the judiciary is incapable of determining the "best interests" of children, just as the plaintiffs in *Wilder* argued that the judiciary was incapable of determining what constitutes "reasonable and adequate" hospital rates. *See Wilder*, 496 U.S. at 519, 110 S.Ct. at 2522. In response, the Court observed:

> That the [Boren] [A]mendment gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the amendment, but it does not render the amendment unenforceable by a court. While there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act. Although some knowledge of the hospital industry might be required to evaluate a State's findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the Judiciary.

*Id.* at 519–20, 110 S.Ct. at 2522–23 (footnote omitted) (emphasis in original).

The obligations imposed by the McKinney Act involve, for the most part, the exercise of judgment by a local educational agency. A court, however, may discern whether the criteria or procedures adopted by the agency are reasonably designed to aid it in making the school placement decision. Moreover, we have little doubt that the court would also have the competence to determine whether the District had complied with its obligation to assign a particular homeless child to a school that was in his best interests.

In recent years, the courts of this circuit have frequently been called upon to determine whether the District of Columbia public school system had met a comparable obligation under the Education for the Handicapped Act, 20 U.S.C. §§ 1400 *et seq.* (1988), which requires participating States to assure handicapped children of an "appropriate education." *See, e.g., Kerkam v. Superintendent, D.C. Public Schools*, 931 F.2d 84 (D.C.Cir.1991); *Knight by Knight v. District of Columbia*, 877 F.2d 1025 (D.C.Cir.1989). Although the criteria and procedures set forth in the Education for the Handicapped Act are more detailed than those in the McKinney Act, the ultimate determination made under that Act—that the handicapped child's education is "appropriate" to his needs—is no less vague or amorphous than the one at issue here. As in *Kerkam* and *Knight*, should a dispute arise between the educational agency and the parents of the homeless child as to whether the school to which the child has been assigned is in his best interest, a court is clearly competent to consider the testimony of opposing witnesses and to decide whether the agency's determination of the child's best interest was reasonable.

We conclude, from the foregoing, that section 11432(e)(3) of the McKinney Act confers enforceable rights on its beneficiaries and that appellants may invoke section 1983 to enforce those rights.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's order granting the District's motion to dismiss and remand the case for further proceedings in accordance with this opinion.

*So ordered.*

SENTELLE, Circuit Judge, dissenting:

I respectfully dissent from the court's conclusion that the McKinney Homeless Assistance Act, 42 U.S.C. § 11301 *et seq.* (1988), creates a federal right enforceable under 42 U.S.C. § 1983. I do so recognizing that the question is a close one, though in my mind it should not be. That is, I agree with Justice Powell that the Supreme Court in *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), by holding "almost casually, that 42 U.S.C. § 1983 creates a cause of action for deprivations ... of any federal statutory right" distorted the Civil Rights Act far beyond any support in its then already lengthy history. 448 U.S. at 11, 100 S.Ct. at 2508 (Powell, J., dissenting, for himself, Chief Justice Burger and then-Justice Rehnquist). That said, I of course recognize that it is not within our compass to pick and choose which Supreme Court opinions we follow. Nonetheless, in my view, the district court reached the proper result and I would affirm.

Although the Supreme Court has counseled us that in the post-*Thiboutot* framework of § 1983 interpretation "each statute must be interpreted by its own terms," *Suter v. Artist M.*, ⸺ U.S. ⸺, ⸺ n. 8, 112 S.Ct. 1360, 1367 n. 8, 118 L.Ed.2d 1 (1992), obviously, the high court's prior interpretations of other statutes instructs our interpretation of the present one. In *Suter*, as the majority points out today, the Supreme Court found no right enforceable under § 1983 in the Child Welfare Act. In *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court did find such a right in the Boren Amendment to the Medicaid Act. The majority opinion today does a commendable job of cataloging the similarities and differences between the two cases and I will not rehash them. I do not disagree with the majority's summary of either case, only with its conclusion as to the side upon which the McKinney Act falls.

As the majority notes, the *Suter* decision was based at least in part upon the conclusion "that the [statutory] directive to use reasonable efforts was so open-ended, and the resulting state discretion so broad, that judicial enforcement was an impossibility." Maj. op. at 609. That is to say, whatever other grounds may exist for denying judicial enforcement to statutorily-created federal "rights" under § 1983, the "judicial enforcement" of such rights "requires that they not be overly 'vague and amorphous.'" Maj. op. at 612 (quoting *Wilder*, 496 U.S. at 519, 110 S.Ct. at 2522). Therefore, for us to undertake judicial enforcement of rights under the McKinney Act presupposes an ability by the federal courts to carry out for the recalcitrant state the duty of determining school assignments in the "best interests" of children and youths. To me this is no less vague and amorphous than the "reasonable efforts" language which the Supreme Court in *Suter* held insufficient to create such an enforceable right.

Certainly the majority is correct that in other circumstances courts must determine the "best interests" of particular children. However, the usual exercise of judicial wisdom in pursuit of the "best interests" of a particular child is just that—a particularized one. Here, the courts would be called upon to make programmatic decisions not as to the best interest of a particular child, but as to how a grant-augmented state program should be designed to meet the needs of *groups* of particularized children. The programmatic operation of a state agency is not within the judicial competence.

Finally, it appears to me that the genuine statutory duty of a recipient state under the McKinney Act is to "prepare and carry out" a plan, "*designed to*" achieve nine designated goals. 42 U.S.C. §§ 11432(c)(4) & 11432(e)(1). Given the amorphousness of the "designed to" mandate, I do not see how this differs in a controlling way from the Adoption Act construed in *Suter*. There the Court held that statute did not create a right enforceable under § 1983 because it did not "place[ ] any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary." *Suter*, ⸺ U.S. at ⸺, 112 S.Ct. at 1369. The mandating paragraphs of the McKinney Act listed by the majority do not change this. The Adoption Act also contained descriptions of the rele-

vant plan. Indeed, 42 U.S.C. § 671 provided a description of the required plan approximately as detailed, and with as many uses of mandatory words such as "shall" and "will," as does the McKinney Act outlined in the majority opinion. Nonetheless, the Supreme Court held that the statute did not create a civil right enforceable under § 1983.

In my view, the district court in the present case properly deemed *Suter* rather than *Wilder* controlling. I would therefore affirm.