Brenda **LAMPKIN, as legal guardian of Jessica Lampkin and Christine Lampkin, et al., Plaintiffs,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

**Civ. A. No. 92–910 (RCL).**

United States District Court, District of Columbia.

May 4, 1995.

---

James D. Miller, King & Spalding, Maria Foscarinis, National Law Center on Homelessness & Poverty, Washington, DC, for plaintiffs.

Nadine C. Wilburn, Office of Corp. Counsel, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

This matter comes before the court on defendants' motion of March 21, 1995 to vacate the court's order dated March 7, 1995. 879 F.Supp. 116. After considering the filings and oral argument of counsel, and for the reasons more fully set forth below, the court hereby dissolves the injunction issued in its March 7 order, while denying the motion to vacate the order itself.

### I. BACKGROUND

Plaintiffs are homeless mothers in their capacity as legal guardians for their school-age children. They sought prompt provision of educational services, including transportation to and from school, for homeless children in the District of Columbia. On March 7, 1995, the court determined that defendants had violated the McKinney Act, 42 U.S.C. § 11432(e)(3), (8) & (9), by failing to address educational needs of homeless children in a timely fashion; and that defendants had violated 42 U.S.C. § 11432(e)(1)(G) & (9) by failing to provide homeless children with access to adequate transportation to and from school.

Injunctive relief was structured to require the District of Columbia (a) to identify homeless children at the time they first arrive at an intake center, and refer these children within 72 hours for requisite educational services, including transportation; (b) to offer bus tokens to all homeless children who travel more than 1.5 miles to attend primary or secondary school; (c) to offer tokens to a homeless parent or other designated adult escort who accompanies a homeless child to or from school; and (d) to eliminate any delays occasioned by once-a-week distribution of tokens at homeless shelters. On March 25, 1995, the court denied defendants' motion to stay the March 7 order. Meanwhile, the District has taken steps to comply with the injunction.

### II. ISSUES

Defendants contend in support of their motion to vacate, that the District, by letter from the Superintendent of Schools to the U.S. Department of Education, has withdrawn from the McKinney Act Education Program effective March 20, 1995. Accordingly, say defendants, there is no longer a continuing obligation by the District to provide education services to homeless families under the provisions of the McKinney Act relied upon by plaintiffs in this lawsuit.

Plaintiffs raise two objections. First, they argue that the D.C.Code prohibits the District from withdrawing from the McKinney Act Education Program. D.C.Code § 3–206.3(a), until its recent amendment, provided in relevant part that:

> The Mayor is authorized to operate an Emergency Shelter Family Program [ESFP], which *shall* claim federal financial participation to the extent allowable by law for housing assistance and services to homeless families with minor children. (emphasis added).

Similarly, D.C.Code § 3–602.1(e) provided:

> In providing emergency overnight shelter services in accordance with this chapter,

the Mayor *shall* claim federal financial participation to the maximum extent allowable by law for assistance and services to homeless persons and families with minor children. (emphasis added).

Because defendants do in fact operate an ESFP, plaintiffs allege that the District must continue its McKinney Act participation for the remainder of this year, and must apply for federal assistance in future years.

Plaintiffs' second argument against vacating the March 7 order is that the court should use its equitable powers to enforce the March 7 injunction as a remedy for the past wrongs of the District. These past violations of the McKinney Act, assert plaintiffs, warrant the continued enforcement of the court's order for the remainder of the school year—even if the District is no longer obligated to conform to McKinney Act directives.

In response, defendants maintain that all of the plaintiffs are now receiving the educational services that they sought in their complaint. If so, there is no further relief to be awarded. Because this lawsuit is not a class action, defendants contend that plaintiffs do not have standing to seek relief on behalf of unnamed parties. However, one of the plaintiffs, the National Law Center on Homelessness and Poverty, is an organization whose functions include helping homeless people obtain federal and local public assistance. Plaintiffs insist that such an organization has standing to bring actions for persons who benefit from its services when defendants' misconduct causes injury to the organization.

## III. ANALYSIS

### A. Defendants' Withdrawal from the McKinney Act Education Program

In resolving whether the District is obligated pursuant to D.C.Code §§ 3–602.1 and 3–206.3 to apply for federal assistance under the McKinney Act, the court must examine the totality of the statutory scheme governing aid to the homeless. Defendants note, and the court concurs, that the emergency shelter services referred to in § 3–206.3 and § 3–602.1 are under the auspices of the Dis-

trict's Department of Human Services, not the District of Columbia Public Schools. No part of either code section mandates educational assistance for homeless children. In fact, the requirements of both sections relate solely to housing, to services associated with housing, and to counseling connected with employment, mental health and substance abuse. Indeed, D.C.Code § 3–206.9 states that the

> provision of emergency shelter and support services in accordance with this subchapter shall not be construed to require the provision of transportation to or from an emergency overnight shelter or any other services not specifically provided for in this act.

Plaintiffs point to Judge Green's recent decision for this court in *Washington Legal Clinic for the Homeless v. Kelly*, Civil Action No. 93–0691 (D.D.C. April 15, 1994) slip op. There as here, the District attempted to moot plaintiffs' request for an injunction by withdrawing from a federal program. The court held that because the District was operating an ESFP, it was required to claim the "maximum federal assistance possible." *Id.* at 6. However, the specific federal assistance at issue in *Washington Legal Clinic* was the Emergency Assistance (EA) program, in which the District receives partial reimbursement from the federal government for the District's ESFP. *See* 45 C.F.R. §§ 201.6(a), 233.120(a) and 206.10(a). The ESFP is operated by the District's Department of Human Services; the EA program is operated by the U.S. Department of Health and Human Services. Both programs relate to housing. EA is a logical referent where D.C.Code sections 3–206.3 and 3–602.1 mention federal financial participation. The McKinney Act, by comparison, is incongruent with the purpose and design of Chapters 2 and 6 of Title 3.

Legislative history of D.C.Code § 3–206, cited by plaintiffs, purportedly demonstrates that educational assistance was intended to be included within the ambit of the statute. Several witnesses testified that children residing in temporary shelters would be negatively impacted if "shuffled from school to school during the academic year without the

stability necessary to foster their emotional growth and well-being." Council of the District of Columbia Report on Bill 7–224, at 3, July 7, 1987. The Committee on Human Services reported that an intent of the bill was to protect the "health, safety and general public welfare" of homeless children. *Id.* Plaintiffs construe "general public welfare" to encompass education and transportation services. These statements are a shaky foundation on which to build an argument for legislative intent. Statements of witnesses are certainly not authoritative. And catch-all concerns over public welfare are too amorphous to commit the city to participate in every federal program that might tangentially or peripherally bear upon the condition of the homeless.

 The District of Columbia Public Schools do not operate a Title 3 program. Accordingly, the court finds that sections 3–206.3 and 3–602.1 do not compel the Mayor to apply for McKinney Act assistance, nor do they embrace education or transportation services for the homeless.

There is a second basis upon which to uphold the District's withdrawal from the McKinney Act Education Program. On April 5, 1995, defendants represented to the court that the D.C. City Council had amended Code sections 3–206.3 and 3–602.1. Emergency legislation, enacted by the City Council on April 4, 1995 and signed into law by the Mayor on April 11, 1995, leaves no doubt that the Mayor has discretion to apply or not to apply for federal financial participation when the District operates an ESFP. Section 3–602.1(e), as amended, now reads: "In providing emergency overnight shelter services in accordance with this chapter, the Mayor *may* claim federal financial participation...." (emphasis added). Section 3–206.3(a) now reads: "The Mayor is authorized to operate an Emergency Shelter Family Program, which *may* claim federal financial participation." (emphasis added).

The City Council has proposed identical language for incorporation in temporary and permanent legislation, both of which require Congressional review. However, the emergency amendment went into effect immediately upon its signing by the Mayor, without the need for Congressional review, and will remain in effect for a maximum of 90 days as provided in D.C.Code § 1–229(a).

In response, plaintiffs make the following three arguments: First, no emergency existed that would justify bypassing the normal legislative process. Second, the District failed to give appropriate public notice of the proposed amendment. Third, the District must comply with the requirements of the McKinney Act even if it no longer receives federal funds under the Act's Education Program. None of these arguments is persuasive.

Standards for emergency legislation are addressed by the Rules of Organization and Procedure for the Council of the District of Columbia. Rule 412(b) defines an "emergency" as

a situation that adversely affects the health, safety, welfare, or economic well-being of a person for which legislative relief is deemed appropriate and necessary by the Council, and for which adherence to the ordinary legislative process would result in delay that would adversely affect the persons whom the legislation is intended to protect.

Plaintiffs assert that the amendment to the D.C.Code would not protect any person whose welfare was adversely affected. Accordingly, maintain plaintiffs, there was no emergency and the legislation was therefore invalid. The court disagrees. The District is currently struggling to overcome financial difficulties that have imposed extraordinary burdens on its citizens and its taxpayers. While the parties may dispute whether the District of Columbia qualifies as a "person" under Rule 412(b), there can be no question that District taxpayers, who must finance the costs of compliance with the McKinney Act, are indeed persons.

Defendants have stated repeatedly that the District's financial complications underlie its vigorous efforts to extricate itself from the March 7 injunction. The emergency legislation passed by the City Council on April 4 was intended to shield D.C. taxpayers from the cost of complying with certain federal programs. In his March 30, 1995 letter

transmitting the legislation to the Council, Mayor Barry described its purpose as proscribing payment "for costs of services after funds appropriated for the services are exhausted."

■ The D.C. Court of Appeals has given "substantial deference to the Council's definition and determination of 'emergency circumstances'.... [I]n looking at a legislatively declared emergency, we seek only to assure ourselves that the act is facially valid." *American Fed'n of Gov't Employees v. Barry*, 459 A.2d 1045, 1051 (D.C.App.1983). Exigent economic circumstances that threaten the District's limited resources are sufficient justification for emergency legislation. *Id.* So also is a "serious budget crisis brought on by declining revenues and increases in uncontrollable spending." *Atchison v. District of Columbia*, 585 A.2d 150, 152 (D.C.App. 1991). Whatever harms may be inflicted upon homeless children by the District's action, the court cannot as a legal matter find that the process of enacting the emergency legislation violated Rule 412(b).

■ Council Rule 426 requires that public notice of intended emergency action must be given prior to adoption of an emergency bill or resolution. Permissible methods of notification include publication, mail, "[p]osting notice in a prominent place in the District Building and other public buildings or posting places," or "any other manner directed by the Council." D.C. Council Rule 425. Plaintiffs claim that the District failed to give appropriate public notice in this instance. But the District, by means of a declaration from Ms. Phyllis Jones, Chief Administrative Officer, Secretary to the District of Columbia Council, has demonstrated to the court's satisfaction that the District fulfilled its obligation to give notice.

The requisite Notice of Intent to Move Emergency Legislation was provided to Jones by Councilmember Linda W. Cropp, who introduced the measure. A copy has been submitted to the court and it appears regular on its face. Jones declares that she timely received the Notice of Intent; that her office by custom and policy immediately posts all such notices in the District Building, and only in the District Building; that this custom and policy for emergency legislation has been in effect for the past four years; that it was effectuated pursuant to a directive from the Council; and that no unique circumstances occurred during the relevant time frame that would have precluded the normal practice from being followed. Due to the high volume of proposed legislation and other notices handled by her office, Jones cannot attest specifically to the posting of Cropp's Notice. Still, the Jones declaration establishes a presumption of regularity that the court finds sufficient under the circumstances.

Lastly, plaintiffs suggest that withdrawal from the McKinney Act Education Program would not relieve the District of responsibility to comply with the Act. This argument defies logic and common sense. The Act, at 42 U.S.C. § 11432(c), authorizes the Secretary of Education "to make grants to States to carry out the activities" enumerated. The District of Columbia is included as a "State" pursuant to 42 U.S.C. § 11421(d). Quite clearly, the Act is meant to apply only to those states that receive grants. Section 11432(e)(1) declares that "[e]ach State shall adopt a plan to provide for the education of each homeless child...." It is simply inconceivable that Congress intended to coerce every state to adopt a plan that would serve as a blueprint for the expenditure of grant funds that the state would not receive.

Plaintiffs point to subsections 11432(e)(7) and (8), where coverage is specifically limited to each local educational agency "that receives assistance under this subchapter." Thus, Congress knew how to restrict coverage when it wanted to. But for purposes of the McKinney Act, the District is a "State" not a "local educational agency." Under the Act, states that receive grants may or may not allocate portions of their grant to local agencies. *See, e.g.,* 42 U.S.C. § 11432(c)(6). Congress may therefore have found it necessary or desirable to distinguish the obligations of local educational agencies that receive assistance from those agencies that do not. Both could coexist within the McKinney Act framework. By contrast, *states* that do not receive McKinney Act assistance are states to which the Act has no application.

The D.C. Circuit Court of Appeals concurs. *Lampkin v. District of Columbia*, 27 F.3d 605, 611 (D.C.Cir.1994). In reviewing various sub-sections of section 11432(e), the court agreed that the language did not specifically exclude any state. Nonetheless, the court concluded: "The language of these provisions is sufficiently clear to put the States on notice of the obligations they assume *when they choose to accept grants* made under the Act." *Id.* (emphasis added).

### B. Injunctive Relief to Remedy Past Wrongs

Plaintiffs and defendants disagree about the extent of compliance with the court's March 7 order. They disagree whether plaintiffs have obtained all of the relief originally sought. And they disagree whether any of the plaintiffs have standing to request injunctive relief as a remedy for past wrongs by the District. Because the court is unwilling to invoke its equitable powers to provide further injunctive relief, it is unnecessary to reach these disputed issues.

Injunctions are generally characterized as preventive, structural or reparative. *See, e.g.,* Dan B. Dobbs, *Law of Remedies* 164 (Hornbook Series, 2d ed. 1993). A preventive injunction attempts to foreclose a future harmful act; it would be improper unless the defendant is threatening to commit a wrong. The purpose of a structural injunction is to remodel an existing social or political institution to bring it into conformity with constitutional demands; e.g., restructuring a school system to facilitate equal educational opportunities. Structural injunctions are typically used as public law remedies for serious and pervasive rights violations. A reparative injunction prevents the future harmful effects of past acts; it requires the defendant to restore the plaintiff to a preexisting condition to which plaintiff was entitled.

Here, having withdrawn from the McKinney Act Education Program, the District will no longer be committing a wrong. Nor is there a cognizable danger of recurrence, absent re-application for McKinney Act assistance. Nor are constitutional rights at stake. A preventive or structural injunc-tion would be manifestly inappropriate. Arguably, a reparative injunction might cleanse the effects of the District's past transgressions, as documented in the court's March 7 opinion. The basis for issuing such an injunction is a balancing of benefits versus costs. *Id.* at 166. In this case, the balance weighs heavily against injunctive relief.

On the benefit side, a reparative injunction would provide the plaintiffs the very thing to which they were formerly entitled under the McKinney Act. But two facts militate against this potential benefit. First, plaintiffs' ephemeral entitlement disappeared on March 20 when the District withdrew from the Education Program, affirmed on April 11 when the Mayor signed the emergency legislation. Second, section 3–206.9 of the D.C.Code is unambiguous: "[N]othing in this subchapter shall be construed to create an entitlement in any homeless person or family to emergency shelter or support services."

On the cost side, a reparative injunction would be a draconian cure for several reasons. First, without a continuing wrongful act to correct, an injunction would unduly intrude upon the operation of the District of Columbia government. Second, relief would be coerced by the court in respect of parties that were not before the court. Third, there is nothing in the record that particularizes the harm suffered by each plaintiff. Consequently, it would be most difficult for the court to structure injunctive relief that even roughly corresponds to the past wrongs suffered. In short, the costs of a reparative injunctive far exceed its benefit.

### IV. CONCLUSION

Notwithstanding protestations of concern for the plight of the less fortunate, the District of Columbia government has mounted a vigorous and successful legal challenge to continued application of this court's injunction of March 7, 1995. Whatever commitment the District has to ameliorate the educational obstacles faced by homeless children, that commitment has not survived its head-on collision with budget realities. Defendants have assigned some dollar figure to the cost of compliance with the McKinney Act—

apparently more than the Mayor and City Council are willing to spend on the educational services mandated by the March 7 order.

The court's task is clear. It cannot create out of whole cloth a statutory scheme to do good by the City's homeless children. The court must interpret and apply existing law. Given the District's withdrawal from the Program, there is now no law to apply. Defendants have succeeded in circumventing the requirements of the McKinney Act, thereby denying District citizens the federal assistance that would otherwise have been available. If there is to be a remedy, it lies with the District's voters, not with this court.

The injunction contained in the court's order of March 7, 1995 is hereby dissolved.

SO ORDERED.