**SYLVIA'S HAVEN, INC., Plaintiff,**

v.

**MASSACHUSETTS DEVELOPMENT FINANCE AGENCY, Defendant.**

No. CIV.A. 02–12473–NMG.

United States District Court,
D. Massachusetts.

Oct. 26, 2005.

Kathleen B. Carr, Kathleen M. Conlon, Mary P. Cormier, Steven M. Cowley, Kenneth V. Nourse, Adam P. Samansky, Elizabeth Anderson Spinney, Nicholas J. Rosenberg, Edwards & Angell, LLP, Boston, MA, Patrick F. Linehan, Edward R. McNicholas, Sidley, Austin, Brown, & Wood LLP, Washington, DC, for Sylvia's Haven, Inc., Plaintiff.

Michael G. Paris, Nystrom Beckman & Paris LLP, Boston, Carlotta M. Patten, Metaxas, Norman & Pidgeon, LLP, Beverly, MA, Alan D. Strasser, Kutak Rock

LLP, Washington, DC, for Massachusetts Development Finance Agency, Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

In the present dispute, Plaintiff Sylvia's Haven, Inc. ("SHI"), a non-profit homeless service provider, alleges that defendant Massachusetts Development Finance Agency ("MassDevelopment") violated various federal and state laws in its effort to evict SHI from property that was formerly part of Fort Devens. Defendant filed a motion to dismiss Plaintiff's case for lack of subject matter jurisdiction which was referred to Magistrate Judge Robert B. Collings for resolution. Magistrate Judge Collings issued a Report and Recommendation ("R & R") in which he recommended that Defendant's Motion be allowed.

Plaintiff objects to the R & R and asks this Court to decline to accept and adopt it and to deny Defendant's Motion to Dismiss for lack of subject matter jurisdiction. The defendant has filed a memorandum of law in support of the R & R. Having considered the pleadings, pro and con, the Court now resolves the case as follows.

## I. *Background*

### A. Facts

The factual background of this case is lengthy and complex. In short summary, this case arises out of efforts by MassDevelopment to evict SHI from property that was formerly part of Fort Devens. SHI was awarded the property and entered into a lease with MassDevelopment, a qualified "local redevelopment authority", under the McKinney–Vento Homeless Assistance Act ("McKinney–Vento Act") and the Base Closure Community Redevelopment and Homeless Assistance Act of 1994 ("Base Closure Act"). Those are the two federal statutes that ensure that surplus federal property will be provided to homeless service providers for use to meet the needs of the homeless.

After the lease was signed, problems arose between the parties. SHI claims that MassDevelopment has taken a series of actions to deprive SHI of the meaningful use of the awarded property while asserting that SHI owes allegedly unlawful fees for use of the property. According to Plaintiff, these efforts have culminated in MassDevelopment's "illegal attempt" to evict SHI and its resident homeless families from the Fort Devens premises in denial of their federal rights under the Base Closure Act.

### B. Procedural History

SHI instituted litigation against MassDevelopment in Massachusetts state court to defend against MassDevelopment's eviction efforts and seeking a declaration that it does not owe MassDevelopment the amount alleged, citing, inter alia, the McKinney–Vento Act education provisions and the 1994 Base Closure Act. MassDevelopment removed the case to this Court in late December, 2002 based on federal question jurisdiction. After MassDevelopment filed its answer and counterclaims, SHI filed a First Amended Verified Complaint asserting both state and federal claims.

The claims were for: 1) declaratory judgment pursuant to M.G.L. c. 213A § 1 *et seq.* (Count I), 2) violations of the McKinney–Vento Act and 42 U.S.C. § 1983 (Count II), 3) breach of the lease (Count III), 4) breach of the covenant of quiet enjoyment (Count IV), 5) breach of the implied warranty of habitability (Count V), 6) constructive eviction (Count VI), 7) preliminary and permanent injunction, based on violations of both the McKinney–Vento Act and the Base Closure Act

(Count VII), 8) violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I *et seq.* (Count VIII), and 9) a claim of right to title to real property or the use and occupation thereof under M.G.L. c. 184, § 15 (Count IX).

After an unsuccessful attempt at alternative dispute resolution, MassDevelopment filed a motion for judgment on the pleadings, followed by a motion to dismiss for lack of subject matter jurisdiction. The latter took precedence and after submission of memoranda in support of and opposition to that motion, a hearing was held on May 2, 2005 before Magistrate Judge Collings. He issued his R & R on September 1, 2005, regarding the motion to dismiss for lack of subject matter jurisdiction in which he recommended that Counts I, II, VII, and IX of the Complaint be dismissed "to the extent they involve claims based on federal law", and that the remainder of the case be remanded to the trial court of the Commonwealth of Massachusetts.

Pursuant to Fed.R.Civ.P. 72(b), SHI filed its objections to the R & R. They were submitted in the form of an over-long brief without leave of court but were considered by the Court nevertheless. The Court now makes a de novo determination upon the record, as supplemented by further submissions of counsel, pursuant to the same federal rule. *See Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 5 (1st Cir.1999).

## II. *Legal Analysis*

Plaintiff's objections to Judge Collings's R & R are based on three arguments: 1) the Report incorrectly concludes that SHI is not permitted to bring its § 1983 claim to enforce rights under the McKinney–Vento Act, 2) the Report incorrectly concludes that SHI cannot bring its § 1983 claim to enforce rights under the Base

Closure Act and 3) the Court should permit SHI to amend and replead the Complaint to address the issues raised in the R & R. This Court will address each of these arguments seriatim.

### A. SHI's § 1983 Claim to Enforce Rights Under the McKinney–Vento Act

SHI's argument on this issue contains two elements. First, SHI argues the text and structure of the McKinney–Vento Act clearly provide homeless children and youths with a number of educational rights, including the right to "the same free, appropriate public education ... as provided to other children and youths", 42 U.S.C. § 11431(1), to be enjoyed free from any burden imposed by the State. SHI further argues that it has third-party and associational standing to assert this right on behalf of its resident homeless children. Second, SHI argues that the McKinney–Vento Act also grants specific rights to homeless service providers like SHI and that those rights are properly enforceable under § 1983.

### 1. Enforceable Rights of Homeless Children Under the McKinney–Vento Act

The R & R recites the relevant statutory provisions of the McKinney–Vento Act. On the basis of those provisions, SHI argues that the Act confers a number of educational rights on homeless children but does not indicate a Congressional intent to foreclose a remedy under § 1983. Magistrate Judge Collings did not reject those contentions.

The crucial question left unanswered by Plaintiff's objections to the R & R is one of standing. The R & R concludes that SHI has neither third-party nor associational standing to bring a § 1983 claim under the McKinney–Vento Act on behalf of its resi-

dent homeless children, while SHI strenuously objects to that recommendation.

### a. Third–Party Standing

■ To establish third-party standing, SHI needs to show that: 1) it personally has suffered an injury in fact that gives rise to a sufficiently concrete interest in the adjudication of the absent party's right, 2) the litigant has a close relationship to the absent party and 3) some hindrance exists that prevents the absent party from protecting its own interests. *Eulitt v. State of Maine, Dep't of Educ.* 386 F.3d 344, 351 (1st Cir.2004). The R & R concludes that SHI cannot get past the first prong of the *Eulitt* test. Specifically, Magistrate Judge Collings found that SHI lacks third-party standing to assert the rights of its resident homeless children and families because there was no allegation or evidence that the homeless children living at Fort Devens are not receiving that to which they are entitled by the education provisions of the McKinney–Vento Act, namely a free public education.

SHI responds to that conclusion with three objections:

1) The Magistrate Judge fails to appreciate the fact that only notice pleading is required of it. *See* Fed.R.Civ.P. 8.

2) The R & R would impose a requirement for third-party standing that has not been articulated in any Supreme Court or First Circuit decision addressing the issue, namely that non-litigants themselves suffer an injury in fact. According to SHI, the well-established rules of third-party standing require only that the litigant, as the party seeking access to federal court, suffer an injury in fact sufficient to confer Article III standing.

3) Even if third-party standing rules did require non-litigants to suffer an injury in fact, such an injury need not be a complete deprivation of the right being asserted by the litigating party. Instead, injury in fact requires only that the plaintiff have "a direct stake in the outcome—even though small". *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

SHI's arguments are unpersuasive. The R & R has correctly interpreted the standard for third-party standing. Under the *Eulitt* test, although the litigant is required to demonstrate an injury in fact sufficient to confer Article III standing, the absent third party must also have suffered some sort of injury to or infringement of his rights. *See Playboy Enters. v. Pub. Serv. Comm'n,* 906 F.2d 25, 37 (1st Cir.1990). At no time has SHI asserted that the resident homeless children at Fort Devens have suffered any kind of deprivation of their right to a free public education at the hands of MassDevelopment. Under SHI's interpretation of third-party standing, it could sue MassDevelopment on behalf of its resident homeless children even when those children would have no right to sue MassDevelopment on their own. That would be a perversion not only of the principle behind third-party standing but also of standing principles in general.

SHI cites two cases in support of its position that the absent third-party need not suffer an injury in fact in order for the litigating party to bring suit on his/her behalf: *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), and *Planned Parenthood of Northern New England v. Heed,* 390 F.3d 53 (1st Cir. 2004). Neither case supports SHI's position. In *Powers,* the Supreme Court held that a criminal defendant had standing to raise the third-party equal protection claims of jurors excluded by the prosecution because of their race. Those jurors

suffered an injury in fact that would have allowed them to bring suit on their own. In Heed, as to which the Supreme Court granted certiorari in May, 2005, the First Circuit granted doctors third-party standing to challenge a New Hampshire law that required parental notification before a minor child could obtain an abortion. The absent third-party minors in that case would suffer an injury in fact under the law, specifically the deprivation of their access to medical services and specific risks to their health. In both Powers and Heed, a third party was allowed to bring suit on behalf of an absent party only when that absent party suffered or would suffer an injury in fact. These cases are in direct contravention to the propositions for which SHI cited them.

■ SHI also contends that because its resident homeless children will, in fact, suffer other injuries, namely the loss of the services SHI provides, if it is evicted from the Fort Devens property, it has third-party standing to assert the rights of the children under the McKinney–Vento Act. Once again, SHI's argument does not withstand close scrutiny. First, SHI cannot allege that it is the only homeless service provider capable of meeting the needs of the homeless children at Fort Devens. Second, the McKinney–Vento Act does not provide homeless children with a statutory right to receive support services but rather a right to a free public education. Section 1983 permits a party to sue in federal court only to protect "rights" granted by statute, not for the more amorphous concept of "interests" or "benefits". See Gonzaga Univ. v. Doe, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Even if SHI were an indispensable service provider, which it is not, its eviction from Fort Devens would not impact the right of the resident homeless children to a free public education. Where the resident homeless children at Fort Devens have suffered no deprivation of their right to a free public education nor are in danger of suffering such a deprivation after SHI's eviction, SHI has no third-party standing to assert claims under the McKinney–Vento Act.

### b. Associational Standing

Plaintiff next objects to the R & R's finding that SHI lacks associational standing to assert the rights of its members under the McKinney–Vento Act. The Magistrate Judge concludes that SHI has no associational standing because it is not an "association".

SHI contends that it exhibits organizational traits that confer status as an "association" for purposes of associational standing. Counsel point to the fact that it is a non-profit charitable corporation organized under M.G.L. c. 180 that specializes in providing transitional housing to homeless and abused mothers and their children. SHI also argues that its charitable organization activities allow it to function as a traditional association, as when it requires all residents to share in the expenses related to the residence and holds weekly meetings at which grievances may be raised. See Risinger v. Concannon, 117 F.Supp.2d 61, 71 (D.Me.2000) (noting that the existence of grievance procedures for current and prospective clients is indicia of membership for the purpose of associational standing).

SHI may not be a formal association with members but it has the indicia of an association as the Supreme Court envisioned in Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In that case the Supreme Court held that a state commission had standing to assert the claims of apple growers and dealers because: 1) it served a specialized segment of the community which was the primary beneficiary

of its activities, including the prosecution of this kind of litigation, 2) its beneficiaries had all the traditional indicia of membership in an organization and 3) its fortunes were closely tied to those of its constituency. The same may be said of SHI in its relationship to its resident homeless children. On the basis of this analysis, the Court concludes that the R & R was incorrect when it found that SHI is not an association.

Nevertheless, the fact that SHI is an association does not mean that it has associational standing to assert the claims of its resident homeless children. To establish associational standing, the plaintiff must satisfy three requirements: 1) the members of the association would otherwise have standing to sue in their own right, 2) the interests it seeks to protect are germane to the organization's purpose and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

SHI contends that it has associational standing, but once again it stumbles on the first step. As this Court noted in its analysis of third-party standing in the preceding section, SHI cannot demonstrate that its resident homeless children suffered an injury in fact that was fairly traceable to MassDevelopment's actions. As long as SHI is unable to show an injury to the right of the resident homeless children to a free public education, it cannot assert associational standing on their behalf. In that regard, the conclusion in the R & R is correct and this Court will not disturb it.

### 2. Enforceable Rights of SHI Under the McKinney–Vento Act

On a separate issue, SHI objects to the R & R's finding that it has no enforceable rights of its own under the McKinney–Vento Act. Although the plain text and structure of the Act do not indicate that homeless service providers have enforceable rights, SHI points to the Senate Report issued upon enactment which stated that the Act was intended to "be enforceable in any court of competent jurisdiction by homeless children or their representatives." S.Rep. No. 101–436, at § 5(c)(1990).

■ SHI's argument is unavailing. It has been the practice of the Supreme Court to find that plain meaning can be overcome by compelling evidence of a contrary legislative intent. *See, e.g., Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). In this case, however, the relevant legislative history is inconclusive at best. Where the plain text of the statute is clear and unambiguous, a court must give effect to that expressed intent of Congress. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). Under this principle, SHI has no enforceable right of its own under the plain language of the McKinney–Vento Act.

### B. SHI's § 1983 Claim to Enforce Rights Under the Base Closure Act

The R & R recommends dismissing SHI's § 1983 claim relating to the Base Closure Act on the grounds that the Act does not confer an enforceable right to homeless service providers and that, in any event, SHI has not suffered any injury in fact. SHI disputes that reading of the Act and application of the facts of this case.

### 1. Enforceable Rights of Homeless Service Providers Under the Base Closure Act

Title V of the McKinney–Vento Act, which required federal landholding agen-

cies to make their surplus property available to homeless service providers and to state and local agencies for use in serving the needs of homeless people, was repealed by enactment of the Base Closure Act of 1994. The latter statute was enacted in the midst of the process by which SHI acquired a lease of property at Fort Devens. Realizing that there would be homeless service providers such as SHI that would find themselves caught between two statutes, Congress included language in the Base Closure Act, 10 U.S.C. § 2687 note, to address their unique situation. Section 2687 note specifically provides:

> (5)(A) In preparing a redevelopment plan for buildings and property at an installation covered by such paragraph (7) by reason of this subsection, the redevelopment authority concerned shall

> \*        \*        \*        \*        \*        \*

> (B) in the case of any application by representatives of the homeless that was approved by the Secretary of Health and Human Services before the date of enactment of this Act, ensure that the plan adequately addresses the needs of the homeless identified in the application by providing *such representatives of the homeless* with

>> (i) properties, on or off the installation, that are substantially equivalent to the properties covered by the application;

>> (ii) sufficient funding to secure such substantially equivalent properties;

>> (iii) services and activities that meet the needs identified in the application; or

>> (iv) a combination of the properties, funding, and services and activities described in clause (i), (ii), and (iii).

10 U.S.C. § 2687 note (emphasis added).[1] According to SHI, this statutory language confers upon "representatives of the homeless", like themselves, a sharply defined right to one of the four benefits identified therein.

SHI attempts to marshal various other legal sources in support of its argument. First, SHI points to the Department of Housing and Urban Development ("HUD") regulation interpreting § 2687 note. That HUD regulation no longer refers to "such representatives of the homeless" but instead uses the term "the Title V applicant". 24 C.F.R. § 586.10. Second, SHI notes that the statute and regulation employ mandatory ("shall"), rather than precatory ("may"), terms upon state redevelopment agencies.

Finally, SHI cites the legislative history of § 2687 note and argues that such history bolsters its own interpretation of the statutory language. For example, Senator Pryor, one of the co-sponsors of the bill, spoke repeatedly in terms of the "homeless assistance groups" that would be affected by the legislation. 140 Cong. Rec. S14457 (daily ed. Oct. 6, 1994). Senator Feinstein, the bill's other co-sponsor, included a letter from Maria Foscarinis, Executive Director of the National Law Center for Homelessness and Poverty (NLCHP), in the legislative record. In her letter, Ms. Foscarinis stressed the need to preserve the rights of homeless providers with approved applications. 140 Cong. Rec. S14459 (daily ed. Oct. 6, 1994). SHI argues that the legislative history demonstrates that Congress was aware of the potential unfairness to homeless service

---

**1.** For convenience, citations to the 1994 amendments to the Base Closure Act will be to the note following 10 U.S.C. § 2687.

providers that the change in the law could exact and Congress specifically legislated to preserve the rights for which homeless providers had already applied and which had been approved.

SHI also contends there is no evidence that Congress intended to foreclose a remedy under § 1983 for violations by state redevelopment agencies under § 2687 note. SHI points out there is no other provision in § 2687 note, the regulations promulgated thereunder or in the entire Base Closure Act for any kind of administrative enforcement mechanism to enforce compliance with these obligations by state redevelopment agencies.

The statutory language of the Base Closure Act is ambiguous with respect to the issue of whether homeless providers have their own enforceable right. The Magistrate Judge concluded in the R & R that the references in the Act to "representatives of the homeless" were made in the context of identifying the needs of the homeless and directing efforts toward those needs. Although that argument is persuasive, SHI's alternative interpretation is equally plausible. Faced with such an ambiguity, it is appropriate for this Court to utilize other tools of statutory interpretation.

The legislative history of the Base Closure Act appears to bolster SHI's interpretation that homeless providers were intended to have enforceable rights under § 2687 note. Moreover, given the ambiguity of the statutory language, this Court is permitted to give weight to HUD's interpretation. See *Chevron U.S.A., Inc., v. Natural Res. Def. Council,* 467 U.S. 837, 842-3, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute"). In this particu-

lar case, HUD's interpretation of § 2687 note suggests the conveyance of enforceable rights to homeless providers such as SHI and nothing about that interpretation appears unreasonable or impermissible. Although this is a close question, this Court affords Plaintiff the benefit of all reasonable inferences on a motion to dismiss based on Fed.R.Civ.P. 12(b)(1) and finds that it does have an enforceable right under the Base Closure Act.

### 2. Determination of Whether SHI Has Suffered an Injury in Fact

The R & R concludes that, even if the Base Closure Act did give enforceable rights to a homeless service provider, SHI lacks standing to pursue its § 1983 claim based upon the Base Closure Act because it has suffered no injury in fact. The Magistrate Judge found that SHI's rights under the Base Closure Act were fully satisfied when it received a lease to the property for which it had applied to the Secretary of Health and Human Services. According to the R & R, once MassDevelopment satisfied its obligations under the Base Closure Act by entering into a lease with SHI for property at Fort Devens, its legal relationship with SHI was henceforth grounded in the lease, not the statute.

SHI submits several objections to those R & R findings. First, SHI contends that MassDevelopment never provided the property to it. That allegation is without merit given the fact that SHI occupied the Devens property for nine years and continues to occupy it today.

Second, SHI asserts that MassDevelopment violated the Base Closure Act by failing to provide "alternative benefits" to it, such as the avoidance of certain fees or forebearance on eviction. MassDevelopment's obligations to SHI under the Base Closure Act ended, however, when it provided the property at Fort Devens to SHI.

The "alternative benefits" to which SHI contends it was entitled are spurious.

Finally, SHI objects to the R & R's finding that "[a]t this juncture, whatever rights and remedies Sylvia's Haven may have involve or arise out of the lease." It contends that the Complaint plainly alleges that the lease it entered into with Mass-Development is voidable because certain of its terms violate federal law. If that is true, the lease should not, SHI asserts, stand in the way of any of its rights conferred by the Base Closure Act. But SHI cites no specific provision of federal law that the lease violates. Moreover, SHI's argument that the lease violates the Base Closure Act is even less compelling given that HUD approved the lease as it is required to do under the Act. Surely if the lease were defective or voidable, such a flaw would have been detected by HUD during its mandated review process.

SHI's argument that the lease is the product of coercion and economic duress is similarly unavailing. SHI did not raise that argument before the Magistrate Judge and thus cannot do so before this Court. *Borden v. Sec'y of Health and Human Servs.*, 836 F.2d 4, 6 (1st Cir.1987) ("Appellant was entitled to de novo review by the district court of the *recommendations to which he objected,* however he was not entitled to a de novo review of an argument never raised.").

Although this Court disagrees with the conclusion in the R & R that SHI had no enforceable rights under the Base Closure Act, it agrees with the ultimate recommendation to find that SHI suffered no injury in fact. Therefore, SHI may not bring a § 1983 claim to enforce its rights under the Base Closure Act.

## C. SHI's Request to Amend the Complaint

SHI further objects to the Magistrate Judge's conclusion that its case should be remanded to state court. According to SHI, even if this Court were to find it lacks federal subject matter jurisdiction over SHI's Complaint, SHI should be afforded the opportunity to amend and replead the Complaint so as to address the issues raised in the R & R.

SHI never sought leave to amend the Complaint when responding to MassDevelopment's Motion to Dismiss for Lack of Subject Matter Jurisdiction. Its failure to raise that issue before the Magistrate Judge forecloses this argument in objection to the R & R. *See Borden*, 836 F.2d at 6.

## ORDER

For the foregoing reasons, this Court **ACCEPTS** and **ADOPTS** the Report and Recommendation of the Magistrate Judge and hereby **ALLOWS** Defendant's Motion to Dismiss (Docket No. 47). Plaintiff's request for leave to amend the Complaint is **DENIED.** Defendant's Motion for Judgment on the Pleadings (Docket No. 29) is **DENIED** as moot.

**So ordered.**

## *REPORT AND RECOMMENDATION ON MASSACHUSETTS DEVELOPMENT FINANCE AGENCY'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (# 47)*

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiff Sylvia's Haven, Inc. (hereinafter "Sylvia's Haven") is a not-for-profit charitable organization which operates a transitional housing facility for homeless women and their children on Fort Devens,

a military base in Massachusetts closed under the Base Closure Community Redevelopment and Homeless Assistance Act of 1994 (hereinafter "Base Closure Laws" [2]), Title 10 U.S.C. § 2687 *et seq.* Sylvia's Haven was able to secure use of the land pursuant to the Base Closure Laws by entering into a lease with the Massachusetts Development Finance Agency, successor to the Government Land Bank (hereinafter collectively "MassDevelopment" or the "Agency"), a qualified "local redevelopment authority" (hereinafter "LRA") as defined in the statute. Subsequent to the lease being signed, problems arose between the parties. Sylvia's Haven instituted this litigation alleging, among other things, violations of the Stewart B. McKinney Homeless Assistance Act of 1987 (renamed the McKinney–Vento Homeless Assistance Act in 2000) (hereinafter the "McKinney Act"), as amended [3], Title 42 U.S.C. § 11411 *et seq.*, and the Base Closure Laws.

Originally filed in the state court, this case was removed (# 1) to the United States District Court for the District of Massachusetts in late December, 2002. After the defendant filed an answer (# 3) together with counterclaims which the plaintiff duly answered (# 5), Sylvia's Haven filed a first amended verified complaint (# 11) which remains the operative pleading in this suit. After an attempt at alternative dispute resolution failed (# 23), MassDevelopment first filed a motion for judgment on the pleadings (# 29) [4], followed by the motion to dismiss for lack of subject matter jurisdiction (# 47). The defendant filed a memorandum in support of its dispositive motion (# 48) and, after an extension of time, Sylvia's Haven submitted its opposition (# 52). With leave having been granted (# 60), a reply brief (# 59) and a sur-reply in opposition (# 63) were filed. A hearing was held on May 2, 2005, and at this junction the motion to dismiss for lack of subject matter jurisdiction is poised for decision.

## II. FACTS

The facts as recited hereinafter are gleaned from the allegations of the first amended verified complaint.

---

**2.** The defendant has provided a synopsis of the metamorphosis of base closing legislation:

> Congress enacted the first comprehensive base closure statute in 1988, which governed that round of base closures. Pub.L. No. 100–526, 102 Stat.2623 (1988)(the "1988 Act"). Congress then enacted the Defense Base Closure and Realignment Act in 1990, which governed the next round of closures. Defense Base Closure and Realignment Act of 1990 (Pub.L. 101–510, §§ 2901–2911, 104 Star. 1485, 1808–18), (the "1990 Act"). We use the term "Base Closure Laws" to refer collectively to the 1988 Act, the 1990 Act, as amended, the Base Closure Community Assistance Act (the "Community Assistance Act"), Subtitle A of Title XXIX of the National Defense Authorization Act for Fiscal Year 1994 (Pub.L.103–160), and the Base Closure Community Development and Homeless Assistance Act of 1994 (Pub.L. 103–421, 108 Stat. 4346 (1994)) ("Redevelopment Act"). We use the acronym DBCRA to refer to the Defense Base Closure and Realignment Act, as amended, and codified at 10 U.S.C. § 2687.

Massachusetts Development Finance Agency's Memorandum of Law # 18 at 2 n. 1; *see also* Plaintiff's Opposition # 52 at 2–4.

For consistency and clarity, the Court shall employ the defendant's shorthand.

**3.** As the parties observe, the education provisions of the McKinney–Vento Act were amended as part of the No Child Left Behind Act, P.L. 107–110, 115 Stat.1989 (2002). (# 18 at 2, n. 2; # 52 at 3–4)

**4.** This initial dispositive motion was fully briefed (## 30, 33, 34, 40) and oral argument was heard on February 3, 2005. The matter was taken under advisement and a schedule issued for the filing of a motion to dismiss based on lack of subject matter jurisdiction.

Pursuant to the mandate of Title V of the McKinney Act, the Department of the Army determined that as of October 30, 1995, Fort Devens in Massachusetts would be excess to its needs, and that certain of the property would be suitable for use in assisting the homeless. (# 11 ¶¶ 5, 6) On July 9, 1992, also under the McKinney Act, Sylvia's Haven submitted an Application For Use Of Underutilized Real Property For Facilities To Assist The Homeless (hereinafter "the Application") to the Department of Health and Human Services (hereinafter "HHS"). (# 11 ¶ 7) In the Application the plaintiff requested certain parcels of land together with the buildings and improvements thereon at Fort Devens [5] upon which "to operate a transitional housing program for homeless pregnant women, homeless mothers and their children, and women who have been the victims of domestic abuse." (# 11 ¶ 7) The Application was approved by HHS on August 9, 1992. (# 11 ¶ 11)

Before any interest in the Fort Devens property was transferred to Sylvia's Haven, the McKinney Act was amended by the Base Closure Laws resulting in the transfer of "the authority and obligation of the Secretary of HHS to oversee the implementation process for homeless providers approved by HHS pursuant to and in compliance with the McKinney Act, to a qualified 'local redevelopment authority' ('LRA') as defined in the Base Closure Act." (# 11 ¶ 12) MassDevelopment, the successor to the Government Land Bank, was the designated LRA for Fort Devens. (# 11 ¶ 13)

According to the allegations of the amended complaint, from 1995 MassDevelopment made it known to Sylvia's Haven that the Agency did not want the plaintiff at Fort Devens at all or, alternatively, that the Agency wanted the property approved for use by the plaintiff. (# 11 ¶ 16) MassDevelopment offered to provide other land on Fort Devens to the plaintiff if Sylvia's Haven would voluntarily relinquish the property awarded to it in accordance with its Application. (# 11 ¶ 17) The plaintiff rejected the substitute land because it was smaller and the location was not favorable for the intended use. (# 11 ¶ 17) As a result of the refusal to surrender its rights, MassDevelopment informed Sylvia's Haven that it would not afford the plaintiff any financial assistance. (# 11 ¶ 18)

On April 30, 1996, a five-year lease was executed by and between Sylvia's Haven and MassDevelopment for the use of property at Fort Devens with the plaintiff paying one dollar ($1.00) a year in rent. (# 11 ¶ 19) The lease required Sylvia's Haven to pay property taxes and users fees before the plaintiff was permitted to renovate buildings. (# 11 ¶ 19) On May 16, 1997, the lease was amended to require, *inter alia,* that Sylvia's Haven pay new user fees for the buildings and reimburse MassDevelop-

---

**5.** According to the plaintiff, the property sought was as follows:

Parcel One requested in the Application included 'a 22,250 square foot brick frame building formerly used as a religious educational facility, containing the base chapel, offices, classrooms, an assembly room, an activity room and a nursery.' Parcel Two included five wood frame buildings containing 'a total of 34 three-bedroom townhouse units each containing approximately 1,000 square feet of gross living area.' Parcel

Three included two wood frame buildings containing 'a total of 16 three-bedroom townhouse units each containing approximately 1,000 square feet of gross living area.' Thus, Sylvia's Haven requested 50 townhouse units plus the chapel building. In addition, the property included a complete playground built at cost, on information and belief, of approximately $150,000 (collectively, the "Facility").

First Amended Verified Complaint # 11 ¶ 8.

ment for the education of children on the premises. (# 11 ¶¶ 21, 22) .

Sylvia's Haven expended approximately $800,000 renovating the buildings on the leased property. (# 11 ¶ 25) Within a short period of time after the lease was signed, MassDevelopment dismantled and removed the playground from the plaintiff's leased premises without Sylvia Haven's knowledge or consent. (# 11 ¶ 28) After the plaintiff had spent some $20,000 rehabilitating the chapel building, in the spring of 2001 MassDevelopment informed Sylvia's Haven that the chapel would not be usable because of environmental contamination. (# 11 ¶¶ 29–31) The plaintiff then had to expend additional funds to secure alternate living quarters and office space in lieu of the chapel building. (# 11 ¶ 31)

Also in 2001 Sylvia's Haven lost the use of numerous housing units due to environmental problems (# 11 ¶ 32) and the existence of chlordane gas resulting from pesticide contamination which pre-dated the lease. (# 11 ¶ 33) It is contended that

> The overall effect of the Agency's actions was to deny Sylvia's Haven and homeless women and children the use of the property requested in the Application, approved by HHS and required by law to be provided by MassDevelopment. MassDevelopment deprived Sylvia's Haven of the use of approximately 20 out of the 50 housing units, teaching and training space, office space capable of managing housing and rehabilitation programs for the residents, day care area, nursery, doctor's/nurse's room, storage space for donated furniture, housing for the Executive Director of Sylvia's Haven, and a place of worship, and resulted in out-of-pocket costs to Sylvia's Haven exceeding $400,000.

First Amended Verified Complaint # 11 ¶ 8.

At a July 17, 2002 meeting, Sylvia's Haven received from MassDevelopment a copy of an "Asset Mapping and Conceptual Plan" (hereinafter "the Plan") drafted by The Women's Institute for Housing and Economic Development, Inc. (hereinafter "the Institute") which proposed changes to the plaintiff's leasehold. (# 11 ¶¶ 41–44) The Plan decreased the land encompassed under the lease from twenty acres to two acres, reduced the number of housing units available to homeless women, and failed to provide for daycare, programs, storage, play space for children and a place of worship. (# 11 ¶ 45) On September 18, 2002, the plaintiff formally rejected the Plan, but the parties agreed to meet and negotiate to resolve the differences between Sylvia's Haven and MassDevelopment. (# 11 ¶¶ 48–49)

A meeting was scheduled at MassDevelopment's office on November 1, 2002 at 2:00 P.M. (# 11 ¶ 50) The Agency cancelled the meeting on the morning of November 1st and advised Sylvia's Haven that it was serving the plaintiff with a Notice of Default under the lease on three grounds: (1) purported failure to deliver documentation to MassDevelopment concerning implementation of certain specified components of Sylvia's Haven Support Services Program; (2) purported failure to pay all utility charges attributable to the Lease Premises; and (3) purported failure to pay for the education of Sylvia's Haven residents.

First Amended Verified Complaint # 11 ¶¶ 51, 54.

MassDevelopment simultaneously caused an "open letter" to be delivered to the plaintiff's residents discussing the issues in dispute. (# 11 ¶ 52) Sylvia's Haven denies that it is or was in default under the lease, and on November 30, 2002, responded to the Notice of Default. (# 11 ¶¶ 54–59) Two days later on December 2, 2002,

MassDevelopment formally notified Sylvia's Haven that the lease was being terminated. (# 11 ¶ 60)

### III. THE CLAIMS

In Count I of its first amended verified complaint, Sylvia's Haven seeks a "declaration of its rights and legal relationships in the nature of a declaratory judgment pursuant to G.L. c. 231A § 1 et seq." (# 11 ¶ 62) Violations of the McKinney Act and 42 U.S.C. § 1983 [6] are alleged in Count II. The plaintiff alleges breach of the lease agreement in Count III, breach of the covenant of quiet enjoyment in Count IV, and breach of the implied warranty of habitability in Count V. In Count IV Sylvia's Haven claims to have been constructively evicted from the leased premises.

Plaintiff requests a preliminary and permanent injunction in Count VII as follows:

Sylvia's Haven seeks a temporary restraining order and, after hearing, a preliminary injunction, restraining and enjoining MassDevelopment from and against:

(a) terminating Sylvia's Haven as the approved provider under the McKinney and Base Closure Acts to operate the Facility pursuant to the Application;

(b) terminating the Lease;

(c) failing to provide Sylvia's Haven with "substantially equivalent" properties within the meaning of the McKinney and Base Closure Acts; and

(d) reducing the properties granted under the Application, including 50 housing units of 1,000 square feet each, approximately 20 acres of land, 20,000 square feet of building space

for day-care, programs, meetings, offices, worship, and living quarters for plaintiff's director; and a playground for the children equivalent to the playground removed by the defendant.

First Amended Verified Complaint # 11 ¶ 95.

Violation of the Massachusetts Civil Rights Act, Mass. Gen. L. c. 12, § 11I et seq. is alleged in Count VIII. Lastly, in Count IX, Sylvia's Haven asserts "a claim of a right to title to real property or the use and occupation thereof or the buildings thereon with the meaning of G.L. c. 184, § 15." (# 11 ¶ 104)

### IV. THE APPLICABLE STANDARD

Pursuant to Rule 12(b)(1), Fed.R.Civ.P., a defendant may move to dismiss an action based on lack of federal subject matter jurisdiction. Because federal courts are considered courts of limited jurisdiction, "federal jurisdiction is never presumed." *Viqueira v. First Bank*, 140 F.3d 12, 16 (1 Cir., 1998). Instead, " 'the party invoking the jurisdiction of a federal court carries the burden of proving its existence.' " *Murphy v. United States*, 45 F.3d 520, 522 (1 Cir.), cert. denied, 515 U.S. 1144, 115 S.Ct. 2581, 132 L.Ed.2d 831 (1995) (quoting *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir.1993), cert. denied, 510 U.S. 823, 114 S.Ct. 82, 126 L.Ed.2d 50 (1993)).

Once a defendant challenges the jurisdictional basis for a claim under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction. *Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942); *Aversa v. United States*, 99 F.3d 1200, 1209 (1 Cir., 1996); *Murphy*, 45 F.3d at 522. The First Circuit has held

**6.** The plaintiff alleges that "[t]he pertinent provisions of the McKinney and Base Closure Acts create enforceable rights of action under 42 U.S.C. § 1983 against persons who infringe upon federal statutory rights while acting under color of state law." (# 11 ¶ 67)

that the proponent must clearly indicate the grounds upon which the Court may properly exercise jurisdiction over the matter presented: "[I]t is black-letter law that jurisdiction must be apparent from the face of the plaintiffs' pleading." *PCS 2000 LP v. Romulus Telecomms., Inc.,* 148 F.3d 32, 35 (1 Cir., 1998) (quoting *Viqueira,* 140 F.3d at 18). As a consequence, if the plaintiff fails to show a basis for either diversity or federal question jurisdiction, the district court must grant the defendant's Rule 12(b)(1) motion. In ruling on a motion to dismiss for lack of jurisdiction, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of plaintiff." *Aversa,* 99 F.3d at 1210; *Murphy,* 45 F.3d at 522. That is not to say that this leniency eliminates the plaintiff's burden of proving an appropriate jurisdictional basis. Indeed, a plaintiff cannot assert a proper jurisdictional basis "merely on 'unsupported conclusions or interpretations of law.'" *Murphy,* 45 F.3d at 522 (quoting *Washington Legal Foundation v. Massachusetts Bar Foundation,* 993 F.2d 962, 971 (1 Cir., 1993)).

The defendant has moved to dismiss Counts I, II, VII and IX of the first amended verified complaint on the grounds that Sylvia's Haven has no standing to enforce either the education provisions of the McKinney Act (requiring states to devise plans to give free public education to homeless children) or the Base Closure Laws. MassDevelopment contends that neither the education provisions of the McKinney Act nor the Base Closure laws create rights that may be enforced by private parties. Alternatively, even if the education provisions of the McKinney Act can be viewed as creating individual rights to enforce its provisions, Sylvia's Haven is not an entity protected by the statute, nor does it have third-party

or associational standing to bring its claims. Moreover, even if the Base Closure Laws afford rights to homeless providers, MassDevelopment argues that the plaintiff has received everything to which it was entitled. Needless to say, Sylvia's Haven disagrees with the defendant's positions.

In the context of the motion now before the Court, the issue is clearly drawn: Sylvia's Haven contends that it may enforce rights under certain federal statutes while MassDevelopment argues that in fact the plaintiff has no standing to sue under those statutes. The law with respect to standing has quite recently been summarized by the First Circuit:

Standing doctrine comprises a mix of constitutional and prudential criteria. *See Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004); *N.H. Right to Life PAC v. Gardner,* 99 F.3d 8, 13 (1st Cir.1996). The constitutional core of standing requires that a plaintiff make a tripartite showing: she must demonstrate that she has suffered an injury in fact, that her injury is fairly traceable to the disputed conduct, and that the relief sought promises to redress the injury sustained. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Gardner,* 99 F.3d at 13. The party seeking to invoke the federal court's jurisdiction—normally, the plaintiff—bears the burden of pleading and proof on each step of the standing pavane. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

In keeping with these important concepts, the Supreme Court has embellished the constitutional requirements attendant to standing with an array of prudential monitions. The prudential aspects of standing include "the general

prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen,* 468 U.S. at 751, 104 S.Ct. 3315.

*Osediacz v. City of Cranston,* 414 F.3d 136, 139 (1 Cir., 2005).

Thus it is incumbent upon Sylvia's Haven to meet the three part test in order to establish that it has standing to bring the claims under the McKinney Act and the Base Closure Laws.

## V.  RULINGS

Because of the length of this Report and Recommendation, the Court will set forth at this point its conclusions in order to aid in understanding the discussion which follows.  First, the Court concludes that although the McKinney Act may create rights in the homeless which may be enforced in a Section 1983 action, the plaintiff in the instant case lacks standing to sue to enforce those rights.  Second, the Court rules that under the Base Closure Laws, once an application incorporating the redevelopment plan has been submitted to and approved by HUD, the Secretary of Defense has disposed of the property accordingly, and the approved legally binding agreement has been executed, no federal right exists which can form the basis of a Section 1983 suit by the homeless provider which was a signatory to the legally binding agreement.  In short, there are no remedies under federal law at that point; rather, any claims must arise under the legally binding agreement and must be sought under the state law which governs the legally binding agreement.

## VI.  DISCUSSION

### A.  The McKinney Act

The plaintiff asserts that the fee Mass-Development charged Sylvia's Haven for reimbursement of the costs of the children's education was in violation of the McKinney Act which provides for a free public and appropriate education for homeless children.  Title 42 U.S.C. § 11431(1).  The question is whether a private right of action exists under this statute that is enforceable via Section 1983.

The Supreme Court has explained that "if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action." *Gonzaga University v. Doe,* 536 U.S. 273, 290, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).  "[A] decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 2762–63, 159 L.Ed.2d 718 (2004); *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.")  The Supreme Court has clarified earlier confusion in the case law:

> We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983.  Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  Accordingly, it is rights, not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section.  This being so, we further

reject the notion that our implied right of action cases are separate and distinct from our § 1983 cases. To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983.

\* \* \* \* \* \*

Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes... Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983. But the initial inquiry—determining whether a statute confers any right at all—is no different from the initial inquiry in an implied right of action case, the express purpose of which is to determine whether or not a statute "confer[s] rights on a particular class of persons." This makes obvious sense, since § 1983 merely provides a mechanism for enforcing individual rights "secured" elsewhere, i.e., rights independently "secured by the Constitution and laws" of the United States. "[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything."

*Gonzaga*, 536 U.S. at 283, 284–5, 122 S.Ct. 2268 (citations and footnote omitted).

▐ Absent legislative intent to create a private right, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander*, 532 U.S. at 286–7, 121 S.Ct. 1511. *See also Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81, 84 (1 Cir., 2004)("A private right of action, like substantive federal law itself, must be created by Congress.... The judiciary's task is to interpret the statute that Congress has enacted in order to determine what the statute reveals about Congress's intentions." (citations omitted))

Statutory construction begins with an examination of the language of the statute itself. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (citation omitted); *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232, 239, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004). "If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *K Mart Corp.*, 486 U.S. at 291, 108 S.Ct. 1811 (citations omitted).

The relevant statutory provision reads:

The following is the policy of the Congress:

(1) Each State educational agency shall ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education, including a public preschool education, as provided to other children and youths.

(2) In any State that has a compulsory residency requirement as a component of the State's compulsory school attendance laws or other laws, regulations, practices, or policies that may act as a barrier to the enrollment, attendance, or success in school of homeless children and youths, the State will review and undertake steps to revise such laws, regulations, practices, or policies to ensure that homeless children and youths are afforded the same free, appropriate pub-

lic education as provided to other children and youths.

(3) Homelessness alone is not sufficient reason to separate students from the mainstream school environment.

(4) Homeless children and youths should have access to the education and other services that such children and youths need to ensure that such children and youths have an opportunity to meet the same challenging State student academic achievement standards to which all students are held.

Title 42 U.S.C. § 11431.[7]

There is nothing in these provisions to suggest that Congress has demonstrated any intent to confer a private right of action on organizations assisting homeless people, and certainly no explicit language as required by *Gonzaga.* All references to nonprofit organizations have been repealed[8], and when such references were present there was only a mention of the ability for the Secretary of Education to make contracts with them for funding purposes. In short, when the pertinent language of the McKinney Act is read naturally, no private action for Sylvia's Haven is apparent. *See Bonano,* 365 F.3d at 84 ("The source of any such [private] right [of action] must be found in the text of the statute.")

The legislative history of Title VII of the McKinney Act is silent with respect to the rights of private organizations. From all that appears it is homeless children and their families who are the intended beneficiaries of the Act. While the legislative history refers to funding for private organizations, nothing is stated that would lead to the conclusion that Congress intended a private organization like Sylvia's Haven to be able to sue for violation of the statute. *See* H.R.Rep. No. 100–10, at 30 (1987), *reprinted in* 1987 U.S.C.C.A.N. 397, 400. H.R.Rep. No. 100–10, at 24 (1987), *reprinted in* 1987 U.S.C.C.A.N. 362, 370. Indeed, the legislative history is very similar to the actual text of the Act in establishing the rights of the families and the distribution

---

**7.** As the plaintiff correctly notes, other parts of the statute create specific rights:

Homeless children have the right to choose which school to attend. 42 U.S.C. § 11432(g)(3). They have the right to transportation to and from school. 42 U.S.C. § 11432(g)(1)(J)(iii). They have the right to immediate enrollment, without regard to whether they have records or other paperwork traditionally required by the school. 42 U.S.C. § 11432(g)(3)(C)(iii). They have the right to a written explanation of enrollment decisions. 42 U.S.C. § 1432(g)(3)(E)(ii). Homeless families have the right to appeal such decisions, and to have such appeals decided "as expeditiously as possible." 42 U.S.C. § 11432(g)(3)(E)(ii) and (iii). They have the right to educational services comparable to those given to non-homeless students. 42 U.S.C. § 11432(g)(4). They have the right not to be stigmatized or segregated simply because they are homeless. 42 U.S.C. § 11432(g)(1)(J).

Plaintiff's Opposition # 52 at 11 n. 5.

**8.** Education of homeless children and adults falls under Subtitles A, B, and C of Title VII. Title VII–A which regulated job training for the homeless is no longer in effect; the statute codifying this portion of the Act has been repealed. Title 42 U.S.C. § 11421 (Repealed 1998). This subtitle of the Act authorized the Secretary of Education to make grants to States so the States could create literacy training plans that could include nonprofit organizations. Title 42 U.S.C. § 11421(a)(2)(Repealed 1998). Subtitle B which is currently at issue regulates the education of homeless children and youths. Title VII–C which regulated job training for the homeless is no longer in effect because the statutes codifying this subtitle of the Act have also been repealed. Title 42 U.S.C. §§ 11441–11447 (Repealed 1998). Subtitle C gave the Secretary of Education the ability to enter into contracts with private nonprofit organizations under 42 U.S.C. § 11441(b) to provide for job training for the homeless.

of funds. H.R.Rep. No. 100–174, at 92–95 (1987), *reprinted in* 1987 U.S.C.C.A.N. 441, 471–74.

Although the defendant argues that the education provisions of the McKinney Act do not contain the "clear and unambiguous terms" required to create rights enforceable by any private parties, two courts have concluded differently— the Court of Appeals for the District of Columbia Circuit in *Lampkin v. District of Columbia*, 27 F.3d 605 (D.C.Cir., 1994) and the United States District Court for the Eastern District of New York in *National Law Center on Homelessness and Poverty, R.I.*[9] *v. State Of New York*, 224 F.R.D. 314 (E.D.N.Y., 2004). While *Lampkin* preceded *Gonzaga*, the *National Law Center* case post-dates the Supreme Court decision and, in fact, discusses it at some length. *See National Law Center*, 224 F.R.D. at 318–319. Based on these cases it would likely be concluded that the education provisions of the McKinney Act do confer rights on homeless children that are privately enforceable under Section 1983.

■ Assuming, *arguendo*, that such rights exist, it does not necessarily follow that Sylvia's Haven has standing to seek to enforce them. The Supreme Court has recently reiterated that " '[w]e have adhered to the rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin, supra*, at 499, 95 S.Ct. 2197, 45 L.Ed.2d 343.' " *Kowalski v.*

*Tesmer*, 543 U.S. 125, 125 S.Ct. 564, 567, 160 L.Ed.2d 519 (2004). There are limited exceptions to this rule, and the plaintiff, Sylvia's Haven, argues that in the circumstances of this case it has third-party standing and/or associational standing to bring its claims.

In order to establish third-party standing,

> An individual who asserts the constitutional rights of a third party must, of course, satisfy the Article III requirements of injury in fact, causation, and redressability with respect to the third-party claim. *See Valley Forge Christian Coll. v. Americans United for Sep. of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In addition, that party must satisfy the prerequisites that arise from prudential limitations on the jurisdiction of the federal courts, namely, that the litigant personally has suffered an injury in fact that gives rise to a sufficiently concrete interest in the adjudication of the third party's rights; that the litigant has a close relationship to the third party; and that some hindrance exists that prevents the third party from protecting its own interests. *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Playboy Enters. v. Pub. Serv. Comm'n*, 906 F.2d 25, 37 (1st Cir.1990).

*Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.*, 386 F.3d 344, 351 (1 Cir., 2004).[10]

---

9. Standing was not an issue in this case, but it is to be noted that the plaintiff National Law Center On Homelessness And Poverty, R.I. brought the case *both* individually *and* as parent and natural guardian of A.B., a minor child.

10. According to Moore's, "An association has standing to sue in federal court based either on an injury to the organization in its own right or as a representative of its members

who have been injured." 15 *Moore's Federal Practice 3d* § 101.60[1][a]. Further,

> the test for associational standing is, much like the basic standing inquiry, composed of three parts. The plaintiff association must show that: 1. At least one of its members possesses standing to sue in his or her own right, i.e., that the member can satisfy the three requirements ·of injury, traceability, and redressability; 2. The interests the suit

MassDevelopment correctly notes that Sylvia's Haven has not pleaded any of these elements in its complaint. The plaintiff asserts that nevertheless it cannot be said under the motion to dismiss standard that it will not be able to establish them. Basically Sylvia's Haven contends that these are issues that are not amenable to decision on a motion to dismiss and must await the development of the evidence.[11] While it may be true that questions such as the "close relationship of the parties" and the "hindrance exist[ing] that prevents the third party from protecting its own interests" *Kowalski*, 125 S.Ct. at 567, could not presently be determined, that does not end the inquiry.[12]

The basic problem is that although the plaintiff has alleged that it has been injured by the terms of the lease which require Sylvia's Haven to pay for the costs of the homeless children's education, there is no allegation that the rights created by the education provisions of the McKinney Act, to wit, the homeless children's right to a free public education, have been violated. In other words, Sylvia's Haven, an entity with no individual rights under the statute, is claiming an injury to itself, not an injury to the people protected by the statutory provisions. There simply is no allegation that the homeless children living at Fort Devens are not receiving a free education. Because Sylvia's Haven has no private

seeks to vindicate are germane to the association's purpose; and 3. Neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

15 *Moore's Federal Practice 3d* § 101.60[1][c].

However, it does not appear that Sylvia's Haven is an "association". *See Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C.Cir., 2002)("Petitioner argues that it has associational standing to bring this action. That theory fails. An association only has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000). Fund Democracy stumbles on the first step. It does not appear that Fund Democracy actually has any members.")

**11.** There are times when standing is decided on a motion to dismiss. *See, e.g., Mason v. Morrisette*, 403 F.3d 28, 30 (1 Cir., 2005).

**12.** At oral argument, the plaintiff contended that as a result of the fees imposed by MassDevelopment, Sylvia's Haven was unable to house and provide services to as many homeless women and children as it otherwise

would have. (Transcript # 64 at 23–4) The plaintiff claims to be suing on behalf of these potential clients who would have benefitted from the its services. (# 64 at 24–6) It appears that under the *Kowalski* rationale, however, Sylvia's Haven has no standing to assert the rights of potential residents of its transitional housing at all.

In *Kowalski*, the Supreme Court acknowledged that the general rule that parties must assert their own rights and not those of others was not absolute,

recognizing that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another. But we have limited this exception by requiring that a party seeking third-party standing make two additional showings. First, we have asked whether the party asserting the right has a "close" relationship with the person who possesses the right.... Second, we have considered whether there is a "hindrance" to the possessor's ability to protect his own interests.

*Kowalski*, 125 S.Ct. at 567 (citations omitted). Just as the attorneys in *Kowalski* were found not to have a close relationship with hypothetical, unknown clients, the plaintiff cannot enjoy a close relationship with possible or future homeless women and children; "indeed, they have no relationship at all." *Kowalski*, 125 S.Ct. at 568. Thus, Sylvia's Haven seems to fail to meet the first prong of the two-part test.

right of action on its own behalf under the statute, and the individuals who do have rights under the statute have not been injured, the plaintiff has no standing either personally or in a representative/third-party capacity to bring claims under the education provisions of the McKinney Act.

## B. The Base Closure Laws

With respect to the Base Closure Laws, again the dispositive issue is whether the relevant law creates privately enforceable rights and, if so, whether Sylvia's Haven has standing to seek to enforce those rights. MassDevelopment takes the position that the applicable law does not grant any such rights, but if it does, those rights are limited and Sylvia's Haven received everything to which it was entitled, i.e., access and use of the property at Fort Devens through the execution of a lease as a legally binding agreement for that property. Sylvia's Haven argues that it has rights given the statutory language that imposes a continuing duty on the LRA, in this case, MassDevelopment, to meet the needs of the homeless identified in the Application.

Although the Base Closing Laws are labyrinthian (see footnote 1 *supra*), the parties do not disagree with respect to their evolution. As a consequence, the relevant statutes shall be examined gener-

ally for an overview and thereafter specifically as necessary.

The process by which a military installation is chosen for closing is mandated by statute and has aptly been described as "elaborate." *Dalton v. Specter,* 511 U.S. 462, 464, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994). Between the time in 1991 when it was determined that Fort Devens would be closed[13] and the actual closure of Fort Devens as an active military base in 1996, the initially applicable law, i.e., Title V of the Stewart B. McKinney Homeless Assistance Act of 1987 (renamed the McKinney–Vento Homeless Assistance Act in 2000), as amended, 42 U.S.C. § 11411 *et seq.*, was amended by the Base Closure Community Development and Homeless Assistance Act of 1994 (the "Redevelopment Act"[14]), Title 10 U.S.C. § 2687 note[15], resulting in a significant change in the closure process. As noted earlier, Sylvia's Haven had filed an Application for excess property at Fort Devens and was approved under one law (*see* # 30 at 6), but because MassDevelopment opted to proceed under the new process afforded by the Redevelopment Act (# 30 at 8; # 34 at 5; # 48 at 12), the actual later transfer of the land and facilities was subject to the amended provisions of the Redevelopment Act.

---

13. In its Memorandum In Support of Motion for Judgment on the Pleadings, the defendant notes that "The 1991 Base Closure and Realignment Commission, working under the Defense Base Closure and Realignment Act of 1990 (Pub.L. 101–510, §§ 2901–2911, 104 Stat. 1485, 1808–18), recommended that Devens be closed and that the federal government retain use of 4600 acres. *Report to the President of the Defense Base Closure and Realignment Commission,* 5–6, 5–7(1991)." (# 30 at 2 n. 1)

14. The plaintiff refers to this law as the 1994 Base Closure Act. (*See* Memorandum of Law

# 34 at 3; # 52 at 2) Although the parties disagree with respect to the impact of this 1994 law on the McKinney–Vento Act (an argument which is the subject of the motion for judgment on the pleadings and not addressed herein), there is no dispute regarding the procedural changes rendered by the amendment.

15. For convenience, citations to the Redevelopment Act or Base Closure Act shall be to the note following 10 U.S.C. § 2687. (# 30, Exh. B)

Under the new procedure inaugurated by the Redevelopment Act, it was incumbent upon MassDevelopment as the LRA to conduct outreach efforts and assistance to state and local governments, representatives of the homeless and other interested parties in the communities in "evaluating buildings and property at the installation" (Sec.2905(b)(7)(C)(ii),(iii)), and the governments and other representatives in turn were to submit "a notice of interest" to the LRA for proposed uses of the property and buildings. (Sec. 2905(b)(7)(C)(i)). Thereafter, it was required that the LRA "shall prepare a redevelopment plan for the installation" taking into consideration "the interests in the use to assist the homeless of the buildings and property at the installation in the notices submitted" to the LRA. (Sec.2905(b)(7)(F)(i)) The law provides that:

> In connection with a redevelopment plan for an installation, a redevelopment authority and representatives of the homeless shall prepare legally binding agreements that provide for the use to assist the homeless of buildings and property, resources, and assistance on or off the installation. The implementation of such agreements shall be contingent upon the decision regarding the disposal of the buildings and property covered by the agreements by the Secretary of Defense.

Sec. 2905(b)(7)(F)(ii)(I).

The sole noted limitation on these legally binding agreements is that they are to provide for the reversion of the buildings and property to the LRA should the building and property no longer be used to assist the homeless.[16] (Sec. 2905(b)(7)(F)(ii)(II)) Once completed the LRA "shall provide opportunity for public comment on a redevelopment plan." (Sec. 2905(b)(7)(F)(iii))

When the foregoing steps have been fulfilled, the LRA submits an application incorporating the redevelopment plan to the Secretary of Defense and the Secretary of HUD. (Sec.2905(b)(7)(G)(i)) As part of the application, the LRA is to include a copy of the redevelopment plan together with a summary of the public comments (Sec.2905(b)(7)(G)(ii)(I)); "[a] copy of each notice of interest of use of buildings and property to assist the homeless that was submitted" to the LRA (Sec. 2905(b)(7)(G)(ii)(II)); a summary of the outreach efforts undertaken by the LRA in formulating the redevelopment plan (Sec.2905(b)(7)(G)(ii)(III)); an identification of the homeless representatives with whom the LRA consulted in preparing the redevelopment plan together with "the results of such consultations" (Sec. 2905(b)(7)(G)(ii)(IV)); "[a]n assessment of the manner in which the redevelopment plan balances the expressed needs of the homeless and the need of the communities in the vicinity of the installation for economic redevelopment and other development" (Sec.2905(b)(7)(G)(ii)(V)); copies of the legally binding agreements into which the LRA proposes to enter (Sec. 2905(b)(7)(G)(ii)(VI)). Within two months of receiving the application from the LRA, the Secretary of HUD is to complete a review of the plan in order to determine, *inter alia*, whether the plan meets the needs of the homeless as identified in the consultation process, whether

---

16. It is further provided that:

 If a building or property reverts to [an LRA] under such agreement, the [LRA] shall take appropriate actions to secure, to the maximum extent practicable, the utilization of the building or property by other homeless representatives to assist the homeless.
 Sec. 2905(b)(7)(M)(ii).

the plan appropriately achieves a balance between the needs of the homeless and economic development for the local communities, and whether the proposed plan "specifies the manner in which buildings and property, resources, and assistance on or off the installation will be made available for homeless assistance purposes." (Sec.2905(b)(7)(H)(i)(I)-(V)) When the Secretary of HUD notifies the Secretary of Defense and the LRA that the redevelopment plan meets the statutory requirements, "the Secretary of Defense shall dispose of the buildings and property at the installation" (Sec.2905(b)(7)(J)(ii) and(K)(i)), with such disposal to assist the homeless being "without consideration." (Sec.2905(b)(7)(K)) Once the Secretary of Defense disposes of the buildings and property to the LRA, the LRA "shall be responsible for the implementation of and compliance with agreements under the redevelopment plan." (Sec.2905(b)(7)(M)(i))

■ With the statutory framework sketched, it is time to turn to the specific arguments. First, Sylvia's Haven claims that the Redevelopment Act requires that "base-closure property would be made available to homeless service providers at no cost." (# 52 at 15) Specifically, the Redevelopment Act provided that

> the Secretary of Defense shall dispose of the buildings and property located at the installation that are identified in the plan as available for use to assist the homeless in accordance with the provisions of the plan. The Secretary of Defense may dispose of such buildings or property directly to the representatives of the homeless concerned or to the redevelopment authority concerned. The Secretary of Defense shall dispose

of the buildings and property under this subparagraph without consideration.

Memorandum in Support Of Motion # 30, Exh. A, P.L. 103–421, § 2(K).

In this particular case it is undisputed that the Secretary of Defense disposed of the property directly to MassDevelopment, the LRA, and there is no allegation that any consideration was paid. Thus, the statutory mandate was literally met. What the plaintiff appears to be arguing is that this section of the Act should be extrapolated to mean that Sylvia's Haven should get the buildings and property rent free from the LRA.[17]

There is no support in the statutory language for this contention. Indeed, Sylvia's Haven is focusing one step beyond the statute, i.e., not on the disposal of the property, but rather on what the LRA may do with the property once it is received. It should also be noted that the plaintiff's argument is undercut by the fact that in the lease (the legally binding agreement) submitted as part of the redevelopment plan to the Secretary of HUD, Sylvia's Haven agreed to pay rent, albeit in the amount of one dollar per year. (# 1, Exh. C ¶ 3.2) MassDevelopment's "base reuse plan for Fort Devens" was approved by HUD (# 30, Exh. C), and the lease was thereafter executed by Sylvia's Haven and the defendant. In short, the plaintiff's initial argument is not well-taken.

Next Sylvia's Haven claims to have a right to property under the Base Closure Laws, as well as the ability to sue on that right. Because the plaintiff had an HHS-approved Application for property on Fort Devens (although the property had not yet been transferred) at the time the Redevelopment Act became effective, the homeless

---

**17.** There is no claim advanced that the Secretary of Defense should have disposed of the property directly to Sylvia's Haven.

provider was covered by certain special provisions in the Act. Specifically, the Redevelopment Act provided that:

> (5)(A) In preparing a redevelopment plan for buildings and property at an installation covered by such paragraph (7) by reason of this subsection, the redevelopment authority concerned shall-
>
>      *      *      *      *      *      *
>
> (B) in the case of any application by representatives of the homeless that was approved by the Secretary of Health and Human Services before the date of enactment of this Act, ensure that the plan adequately addresses the needs of the homeless identified in the application by providing such representatives of the homeless with—
>
> (i) properties, on or off the installation, that are substantially equivalent to the properties covered by the application;
>
> (ii) sufficient funding to secure such substantially equivalent properties;
>
> (iii) services and activities that meet the needs identified in the application; or
>
> (iv) a combination of the properties, funding, and services and activities described in clause (i), (ii), and (iii).

P.L. 103–421, § 2(e)(1)(C)(5).[18]

In the plaintiff's view, this language "ensures that a homeless provider with an approved Title V application is entitled to property under the" Redevelopment Act (# 52 at 17) and "impose(s) a continuing duty on the LRA to meet the needs identified in the application". (# 63 at 4) According to Sylvia's Haven, the only way a homeless provider can enforce its rights under the Act is by means of an action under 42 U.S.C. § 1983.

MassDevelopment disagrees with the plaintiff's statutory interpretation. In the defendant's view, the focus and intent of the statute as a whole is to assist and serve the needs of the homeless, not those of the homeless providers. Indeed, a review of the provisions of the Redevelopment Act reveals the law to be replete with references to addressing the needs of the homeless. While it is true that the statute mentions "representatives of the homeless" on several occasions, those references are in the context of identifying the needs of the homeless and directing efforts towards meeting those needs. Like the McKinney Act, there is nothing in these provisions to suggest that Congress has demonstrated any intent to confer a private right of action on organizations assisting homeless people, and certainly no explicit language as required by *Gonzaga.*

This conclusion is buttressed by the statutory provision upon which Sylvia's Haven relies. Public Law 103–421, § 2(e)(1)(C)(5) is drafted in the disjunctive. When preparing the redevelopment plan, that statute afforded the MassDevelopment discretion in how adequately to

---

18. The applicable HUD regulation similarly provides:

> (2) For installations with Title V applications approved before October 25, 1994 where there is an approved Title V application, but property has not been assigned or otherwise disposed of by the Military Department, the LRA must ensure that its homeless assistance submission provides the Title V applicant with:
> (i) The property requested;
> (ii) Properties, on or off the installation, that are substantially equivalent to those requested;
> (iii) Sufficient funding to acquire such substantially equivalent properties;
> (iv) Services and activities that meet the needs identified in the application; or
> (v) A combination of the properties, funding, and services and activities described in § 586.10(b)(2)(i) through (iv).

24 C.F.R. § 586.10(b)(2).

address "the needs of the homeless" as identified in the plaintiff's Application by providing four alternative means (five in the regulation). Theoretically the defendant could have chosen option (ii) or (iii) and provided funds or "services and activities that meet the needs identified in the application" respectively to Sylvia's Haven, and not provided any property at all. In other words, the Redevelopment Act did not guarantee Sylvia's Haven certain property, it ensured that "the needs of the homeless identified in the application" were met by MassDevelopment providing Sylvia's Haven with property, funding, services and activities, or a combination thereof. This scenario underscores the fact that the intent of Congress was to benefit the homeless, not the homeless providers.[19]

Further, a review of the allegations of the first amended verified complaint, the Application and the terms of the lease reflects that Sylvia's Haven was provided the property sought in the Application. In its introductory paragraphs, the lease provides as follows:

WHEREAS, the Tenant, pursuant to the terms of the Stewart B. McKinney Homeless Assistance Act, as amended (the "McKinney Act")(42 U.S.C. § 11303, et seq.), submitted an application to the Secretary of Health and Human Services ("HHS") requesting certain parcels of land located at Fort Devens to operate a transitional housing program for homeless pregnant women, homeless mothers and their babies, homeless women, and homeless abused women and their children, which application was approved by HHS in August of 1992; and

WHEREAS, pursuant to Chapter 498 of the Massachusetts Acts of 1993, as amended, the Land Bank was designated as the local redevelopment authority authorized to oversee and implement the civilian reuse and redevelopment of Fort Devens in accordance with a locally-approved reuse plan and bylaws (the "Reuse Plan"); and

WHEREAS, the McKinney Act was amended by the Base Closure Community Redevelopment and Homeless Assistance Act of 1994 (the "Act"), which transferred the authority of the Secretary of HHS, to oversee the implementation process for homeless providers approved by HHS under the McKinney Act, to the local redevelopment authority; and

WHEREAS, the *Land Bank, acting as the local redevelopment authority under the terms of the Act and the Tenant have agreed to enter into a lease for property identified in the Tenant's application submitted to HHS*, pursuant to the terms hereof which lease is subject to the approval of the Department of Housing and Urban Development and the Department of the Army.

First Amended Verified Complaint # 1, Exh. C at 1–2 (emphasis added); *compare* # 1, Exh. A, Section 4, Part A (Application) with # 1, Exh. C, Exh. A (Lease Premises).

This lease (legally binding agreement) was part of the redevelopment plan which was approved by HUD. After the property at Fort Devens was disposed of to Mass-Development, the plaintiff and defendant

---

**19.** The plaintiff's claim to a property right is also rendered suspect by the statutory provision which calls for "the reversion to the redevelopment authority concerned. . . . of buildings and property that are made available under this paragraph for use to assist the homeless in the event that such buildings and property cease being used for that purpose." (Sec.2905(b)(7)(F)(ii)(II))

executed the lease which provided "the property identified in the Tenant's application to HHS." At this juncture, whatever rights and remedies Sylvia's Haven may have involve or arise out of the lease. The Redevelopment Act does not grant, directly or impliedly, a private right of action to a homeless provider such as Sylvia's Haven.

## VII. CONCLUSION AND RECOMMENDATION

For the reasons stated, I RECOMMEND the Massachusetts Development Finance Agency's Motion To Dismiss For Lack Of Subject Matter Jurisdiction (# 47) be ALLOWED with respect to Count II as well as Counts I, VII and IX to the extent they involve claims based on federal law, and otherwise DENIED. I FURTHER RECOMMEND that the case be REMANDED to the trial court of the Commonwealth of Massachusetts. *See Christopher v. Stanley–Bostitch, Inc.*, 240 F.3d 95, 100 (1 Cir.), *cert. denied sub nom Stanley Works v. Christopher*, 534 U.S. 820, 122 S.Ct. 52, 151 L.Ed.2d 22 (2001).

## VIII. REVIEW BY THE DISTRICT JUDGE

The parties are hereby advised that pursuant to Rule 72, Fed.R.Civ.P., any party who objects to these recommendations must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed.R.Civ.P., shall preclude further appellate review. *See Keating v. Secre-*

*tary of Health and Human Services,* 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia–Copete,* 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).